**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **LUIZA DUBROVSKY,** | |
| Plaintiff, | **COMPLAINT** |
| -against- | Case No.: 23-cv-10149 |
| **JOHN STEVEN STEWART**<br>**and COLE SCHOTZ P.C.,** | |
| Defendants. | |

Luiza Dubrovsky ("**Luiza**" or "**Plaintiff**"), by and through undersigned counsel, as and for her complaint against John Steven Stewart ("**John**") and Cole Schotz P.C. ("**CSPC**") (together, "**Defendants**"), alleges as follows.

## INTRODUCTION

1.      This Action concerns the legal malpractice of John and CSPC arising out of their concurrent representation of the adverse interests of two clients in connection with a series of commercial transactions, including secured loans and sales of membership interests related to mixed-use real estate at 172-174 Madison Avenue and 176 Madison Avenue (a/k/a 21 East 33rd Street), New York, New York ("**Madison 33 Property**").

2.      From July 2013 to June 2017, John and CSPC represented the interests of and acted to protect their client Natalia Pirogova ("**Natalia**") at the foreseeable expense of their other client, Luiza, who became Natalia's nominee to hold title to Natalia's 40% interest in the Madison 33 Property in Luiza's name and for Natalia's benefit ("**Madison 33 Interest**" or "**Interest**").

3.      John's and CSPC's concurrent representation of Luiza and Natalia in connection with the Madison 33 Interest, which was held and transacted in Luiza's name, resulted in more than $4 million in injuries to Luiza, in addition to approximately $50 million in entered and anticipated judgments.

4.      In 2019, Luiza withdrew her crossclaims against John and CSPC from the lawsuit captioned *FGP 1, LLC et ano. v. Luiza Dubrovsky et al.* (Index No. 650479/2016) ("**FGP Action**") and the action captioned *Denis Goldberg et al. v. Luiza Dubrovsky et al*. (Index No. 653357/2019) ("**Goldberg Action**") pursuant to a Tolling Agreement with an effective date of October 1, 2019 and an expiration date of November 20, 2023.

5.      Both the FGP and Goldberg Actions are investor claims against Luiza concerning transactions relating to the Madison 33 Interest while Natalia and Luiza were concurrently represented by John and CSPC as their transactional attorneys and advisors.

6.      In 2020, a Russian bank judgment creditor, PJSC National Trust Bank ("**Trust Bank**"), commenced an action against Luiza related to Luiza's service as nominee related to the Madison 33 Interest arising under New York Debtor and Creditor Law.  The action is captioned, *PJSC National Bank Trust v. Natalia et al.* (Index No. 160130/2020) ("**Trust Bank Action**").

7.      The FGP Action, Goldberg Action, and the Trust Bank Action are pending in the Supreme Court, New York County ("**Pending Litigation**").

8.      Luiza is a now a 75-year-old single woman who is financially ruined by a series of transactions transacted in her name on Natalia's behalf and relating to the Madison 33 Interest.

9.      John and CSPC represented Natalia and Luiza in these transactions.

10.      John and CSPC prepared these transactions to give Natalia monetary benefits and Luiza monetary liabilities.

11. These transactions also funneled away the value of the Madison 33 Interest from which Luiza was to be compensated for her service to Natalia as nominee of the Interest.

12. John and CSPC participated and counseled Natalia in the successful liquidation of the value of the Madison 33 Interest so as to destroy Luiza's ability to recover compensation therefrom, and contemporaneously, John and CSPC failed to counsel Luiza for secured indemnitee protections as the nominee of Natalia's Interest and repeatedly advised her she would have no liability.

13. John and CSPC, as attorneys for Luiza, also prepared all the transactional papers that double sold the same Interest to competing investor-purchasers (*i.e.*, plaintiffs and defendant MIC in the FGP Action).

14. Not only investors, including those that lent Natalia money in promissory notes purportedly secured by the Madison 33 Interest (*i.e.*, plaintiffs in the Goldberg Action), but also, Natalia's creditors allege they were defrauded in Luiza's service as nominee for Natalia's Madison 33 Interest.

15. As a result of John's and CSPC's legal counsel to and representation of Luiza in connection with Natalia's company's bankruptcy in 2013, through which Luiza became the record owner of the Madison 33 Interest by the advice and counsel of John and CSPC, Trust Bank has sued Luiza under the NY DCL as the alter ego of Natalia in what Trust Bank alleges was a fraudulent conveyance of the Madison 33 Interest.

16. The Pending Litigation cases seek judgment against Luiza in excess of $50 million.

17. John and CSPC also represented Luiza and Natalia in connection with Natalia obtaining a $2.2 million mortgage on Luiza's former Central Park West ("**CPW**") residence. John and CSPC prepared the transaction so that Natalia received the proceeds of the mortgage loan but

Luiza got the liability if Natalia did not repay the loan. Natalia did not repay the loan, and the lender foreclosed in 2019 after John and CSPC advised Luiza to waive all her defenses in connection with obtaining lender forbearance for Natalia, and which resulted in the loss of Luiza's equity in the CPW residence (approximately $300,000) and a judgment against her in favor of the lender in the amount of $165,000 for its attorney's fees.

18.     In 2017, John and CSPC counseled Luiza to transfer the deed to her other residence at 220 Riverside Drive ("**220 Riverside**") to one of Natalia's former attorneys, Edward Mermelstein ("**Mermelstein**"), to satisfy a $1 million debt Natalia purportedly owed Mermelstein. John knew Luiza was under no personal obligation to transfer her 220 Riverside residence but advised Luiza to transfer it anyway so as to benefit Natalia's interests at Luiza's expense, resulting in the loss to Luiza of all her equity in 220 Riverside (approximately $500,000).

19.     Luiza sustained not less than $3 million in damages resulting from the loss of the compensation due to her for her participation in the 2013 bankruptcy and related closing which resulted in creating the 40% beneficial Interest for Natalia, which Natalia liquidated and benefited from, and by which John and CSPC billed significant attorney's fees.

20.     Luiza has not less than $540,000 in damages resulting from the loss of her equity in the CPW residence ($300,000.00 equity, plus $165,000 judgment plus $75,000 in defense costs and attorney's fees).

21.     Luiza has at least $500,000 in damages resulting from the loss of her equity in 220 Riverside.

22.     Luiza has not less than $380,000 in damages resulting from defense costs and fees in the Pending Litigation with the investors and Trust Bank.

23.     Since 2017, Luiza has not been able to lead a normal life.

24.     Luiza suffers from the trauma she endured from John's and CSPC's malpractice and she also has significant liabilities and losses as described.

## PARTIES

25.     Defendant Cole Schotz P.C. ("**CSPC**") is a professional corporation incorporated under the laws of the State of New Jersey with a principal office located in Hackensack, New Jersey, Bergen County.  CSPC became authorized to do business in the State of New York as a foreign corporation in 2006 and currently does business in the State of New York.

26.     Defendant John Steven Stewart ("**John**") is a natural person residing in the State of New Jersey, Bergen County.  John is and has been an attorney licensed to practice in New York since 1998 and in New Jersey since 2005.  John is an equity member of CSPC.   John was a CSPC agent, employee, and/or member while Luiza's attorney.

27.     Plaintiff Luiza Dubrovsky ("**Luiza**") is a natural person residing in the State of New York, and a former client of John and CSPC.

## RELEVANT NON-PARTIES

28.     Natalia Pirogova ("**Natalia**") is a natural person residing in the State of New York. Natalia is a former client of John and CSPC.

29.     Edward Mermelstein ("**Mermelstein**") is a natural person residing in the State of New York.  Mermelstein is a real estate investor and real estate attorney in New York.

30.     Yitzhak Tessler ("**Tessler**") is a natural person residing in the State of New York. Tessler is a real estate investor and developer.

31.     Kenneth Percy a/k/a Robert Traktor a/k/a Robert Blessy ("**Percy**") is a natural person whose residence is unknown.  Percy is a disbarred New York attorney.  Percy is a former attorney and advisor to Natalia.

5

## JURISDICTION AND VENUE

32.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (a)(2) as Plaintiff is a citizen of the State of New York, Defendants are both citizens of the State of New Jersey, and the amount in controversy exceeds the statutory threshold set forth in 28 U.S.C. § 1332 (b).

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in this District.

34.      Venue also is proper in this District pursuant to 28 U.S.C. § 1391(d) as Defendant CSPC has significant contacts with this District by maintaining a branch office in Manhattan.

## FACTUAL BACKGROUND

*A.*     *February 2010 Engagement*

35.     In or around February 2010, John and CSPC agreed to represent Natalia and one or more of her companies to represent her and one or more of her companies with respect to Natalia's interest in the 172 Madison Real Estate Project ("**February 2010 Engagement**").

36.     The **172 Madison Real Estate Project** involved the ownership and commercial development of a mixed-use building located at 172-174 Madison Avenue and 176 Madison Avenue (a/k/a 21 East 33rd Street), New York, New York ("**Madison 33 Property**").

37.     John and CSPC received the 172 Madison Real Estate Project representation as a referral from Mermelstein, Natalia's then-attorney and/or advisor.

*B.*     *July 2013 Engagement*

38.     In or around July 2013, John and CSPC began providing legal representation to Luiza to serve as Natalia's agent in relation to the Madison 33 Property ("**July 2013 Engagement**").

39.     Their July 2013 Engagement pertained to Defendants' representation of Luiza in her conduct to be undertaken as related to Natalia's equity in the 172 Madison Real Estate Project.

40.     Defendants maintained a continual representation of Luiza within the scope of the July 2013 Engagement until Luiza terminated them as her attorneys in June 2017.

## C.     July 2013 Bankruptcy Filing

41.     In July 2013, John and CSPC represented Luiza in connection with her participation in a voluntary bankruptcy ("**Bankruptcy**") filed by CSPC for Natalia's company NMP Group LLC ("**NMP Group**") which owned the Madison 33 Property.

42.      CSPC filed the Bankruptcy to stay the foreclosure action and preserve the equity in the 172 Madison Real Estate Project against a lender's foreclosure of the Madison 33 Property to pay a $52 million debt mortgaged on the Madison 33 Property.

43.     John and CSPC prepared the Bankruptcy documents to be filed in the Bankruptcy through one or more CSPC attorneys, and they instructed, advised, and counseled Luiza to sign these Bankruptcy documents whereby Luiza attested to matters concerning the Bankruptcy debtor, Natalia's eponymous company, NMP Group.

44.     The Bankruptcy documents Defendants prepared, advised, and counseled Luiza to sign identified Natalia as NMP Group's only member and, started in May 2013, identified Luiza as its manager.

45.     The Bankruptcy documents Defendants prepared, advised, and counseled Luiza to sign further stated that of July 2013, Luiza was the sole owner of an entity organized to receive a 40% indirect beneficial interest in the purchaser of the Bankruptcy debtor's sole asset – the Madison 33 Property.

46.     As a result of or in connection with the Bankruptcy, Luiza was to receive a 40% interest in the Madison 33 Property (*i.e.*, the Madison 33 Interest) to be held through various holding companies Defendants organized and created.

47.     CSPC and John told Luiza at the time of the Bankruptcy that Luiza's receipt of the 40% Madison 33 Interest was for Natalia's benefit.

48.     John did not explain to Luiza the Bankruptcy documents he told her to sign.

49.     Luiza implicitly trusted John and signed the signature pages to a multitude of Bankruptcy and transactional documents that John told her to sign concerning the 172 Madison Real Estate Project and the Madison 33 Interest.

50.     John and CSPC did not counsel Luiza to seek an independent and unbiased and non-conflicted attorney regarding Luiza's performance in connection with the Bankruptcy and regarding Natalia's equity to be held by Luiza in the Bankruptcy purchaser.

51.     John and CSPC gave legal representation to Luiza and Natalia in connection with the preservation and/or creation of Natalia's interest in the 172 Madison Real Estate Project and/or the Madison 33 Interest.

## D.     The Equity Preservation Plan

52.     John and CSPC structured and participated in a plan with Natalia and the Madison 33 Property developer, Tessler, to preserve a portion of Natalia's equity in the 172 Madison Real Estate Project through the Bankruptcy ("**Equity Preservation Plan**").

53.     The Equity Preservation Plan created the Madison 33 Interest (*i.e.*, the 40% indirect interest in the Madison 33 Property), as Natalia's interest in the Madison 33 Property extinguished in the Bankruptcy debtor upon the closing of the Bankruptcy buyer's acquisition of the Madison 33 Property and the closing of the Bankruptcy estate.

8

54. The Equity Preservation Plan details are as follows:

(i) Bankruptcy debtor NMP Group would liquidate its only asset in voluntary bankruptcy to stay the lender's foreclosure judgment and auction;

(ii) NMP Group's creditors would be paid from NMP Group's sale proceeds on the Madison 33 Property to a joint venture between Tessler and Luiza;

(iii) Natalia would acquire or maintain a 40% interest in the venture; and

(iv) Natalia's 40% would be maintained or acquired through the nominal ownership of same by Luiza so that Natalia could control and reap the benefits of the 40% interest in the name of another person.

55. The Equity Preservation Plan was not disclosed to the Bankruptcy court.

56. Luiza was unaware of the details and purpose of the Equity Preservation Plan at all relevant times.

## E.   *The Bankruptcy Plan*

57. The plan Defendants filed in the Bankruptcy court omitted Natalia as maintaining or contemporaneously acquiring a 40% beneficial interest in the Madison 33 Property through the use of a nominal owner in the Bankruptcy purchaser ("**Bankruptcy Plan**").

58. Rather, the Bankruptcy Plan provided that:

(i) the Madison 33 Property would be purchased by Madison 33 Owner LLC ("**Madison 33 Owner**");

(ii) Madison 33 Owner would be 100% owned by Madison 33 Partners LLC ("**Madison 33 Partners**");

(iii) 40% of Madison 33 Partners would be owned by 172 Madison NP Member LLC ("**NP Member**");

(iv)   100% NP Member would be owned by 172 Madison NP Holding LLC ("**NP Holding**");

(v)   100% of NP Holding would be owned by Luiza;

(vi)   Madison 33 Owner's cash purchase was sufficient to cover NMP Group's creditors' claims of $53 million; and

(vii)   Luiza would receive the $15 million difference between the NMP Group then-value of $68 million and the purchase price of $53 million as a "deemed" contribution in the Bankruptcy buyer and represented in the 40% indirect interest in Madison 33 Partners (*i.e.*, the Madison 33 Interest).

59.   On or about July 3, 2013, John and CSPC formed and organized the eponymous holding companies – NP Member and NP Holding – to take title to the 40% Interest.

60.   On or about August 22, 2013, in organizing NP Member and NP Holding, John and CSPC identified Luiza in the governing documents as the sole owner of NP Holding with an effective date of July 3, 2013, which is the date of NP Holding's organization.

61.   On or about August 23, 2013, CSPC filed the Bankruptcy Plan.

62.   John and CSPC knew of Natalia's financial state and illiquidity in the United States and in Russia at the time CSPC submitted the Bankruptcy Plan to the Bankruptcy court.

63.   Luiza was unaware of the extent of Natalia's financial state and illiquidity in the United States and in Russia at the time CSPC submitted the Bankruptcy Plan to the Bankruptcy court, involving Luiza as the indirect owner of the 40% interest in the Bankruptcy buyer.

64.   The Equity Preservation Plan was intended to shield Natalia's interest in the 172 Madison Real Estate Project.

65.     Defendants did not explain to Luiza at the time of the Bankruptcy that the Equity Preservation Plan's purpose was to shield Natalia's interest in the 172 Madison Real Estate Project.

66.     John and CSPC only advised Luiza that her participation in the Bankruptcy would assist Natalia in saving the 172 Madison Real Estate Project from being lost.

67.     At the time, Luiza was working for Natalia as a conversational translator (Russian and English) and executive assistant, and she had become very close friends with Natalia and reposed full trust and confidence in Natalia.

68.     In addition to the Madison 33 Interest, John and CSPC also counseled Luiza in becoming the nominal owner or manager for Natalia of a host of Natalia's other companies ("**Natalia's Other Companies**"),  including LTR Holding Co. LLC, Lightweight Global Rail Systems LLC, Troyka Transportation LLC, Regis Transportation LLC, International Transportation Systems LLC, Miami Exotics LLC, Natalia Pirogoff LLC, and NMP-Group LLC.

## F.     *August 2013 Engagement*

69.     By August 2013, John and CSPC were representing Luiza in connection with her 40% Interest in the 172 Madison Real Estate Project ("**August 2013 Engagement**").

70.      The August 2013 Engagement concerned Defendants' legal representation of Luiza as the owner of the 40% Madison 33 Interest, which was to be in exchange for $3 million from Natalia to be paid to Luiza from Natalia's financings or distributions on the 40% interest.

71.     The August 2013 Engagement continued until Luiza terminated CSPC and John as her attorneys in June 2017.

## G.     *Joint Venture Closing*

72.     On October 28, 2013, the Bankruptcy sale of the Madison 33 Property to the Bankruptcy buyer, Madison 33 Owner, closed ("**JV Closing**").

73.     At the JV Closing, Luiza acquired the 40% Madison 33 Interest.

74.     Defendants participated in the JV Closing as Luiza's attorneys.

75.     Defedants were also attorneys for the Bankruptcy debtor-seller in the JV Closing.

76.     Defendants were also attorneys for Natalia in the JV Closing.

77.     As a result of the JV Closing, Luiza was the 100% owner of NP Holding, which owned 100% of NP Member, which owned 40% of Madison 33 Partners, which owned 100% of Madison 33 Owner, which owned the Madison 33 Property.

78.     At the time of the JV Closing, Defendants knew the following consideration were material to Luiza ("**Material Considerations**"):

a.  Luiza was to be compensated $3 million from distributions or financings on the 40% Interest as consideration for Luiza holding title and participating in the Bankruptcy and the JV Closing;

b.  Luiza was to actually or constructively transfer beneficial ownership of the 40% Interest to Natalia and to remain in title nominally;

c.  Luiza was to be protected as a nominee in the normal course, to protect Luiza from any liability resulting from transactions in the 40% Interest by Natalia as beneficial owner; and

d.  Luiza was to be disclosed to relevant third parties as the nominee concerning the 40% Interest, in such customary agreements and written disclosures whereby third parties could only look to Natalia for liability in respect of any transactions on the 40% Interest and would hold harmless Luiza.

79. Despite Defendants' knowledge of the foregoing Material Considerations at the time of the JV Closing, Defendants failed to reduce to a written agreement the arrangement between Natalia and Luiza, whereby Luiza was to obtain the Material Considerations.

80. Defendants failed to take any action to protect Luiza's Material Considerations as nominee at any time.

81. Defednants failed to counsel Luiza concerning her service as nominee at all times.

## H.    *March 2014 Engagement*

82. By March of 2014, Defendants entered into an engagement with Luiza ("**March 2014 Engagement**") related to financing the 40% Interest.

83. The March 2014 Engagement specifically concerned Defendants' representation of Luiza, Natalia, and entities owned by Luiza (nominally) and Natalia (beneficially), including NP Holding and NP Member, with respect to securing financing and investors related to the 172 Madison Real Estate Project and related to the CPW condominium residence located at 15 Central Park West, Apt. 16H ("**Unit 16H**"), New York, New York..

84. Defendants continued to represent Luiza under the March 2014 Engagement until Luiza terminated them as her attorneys in June 2017.

85. Concerning Unit 16H, Luiza contributed $100,000 to the acquisition price for Unit 16H when she acquired title in 2008, prior to Defendants' representation of Luiza.  At the same time, Natalia contributed $900,000 to Unit 16H's purchase price, and Luiza financed the remaining cost in the amount of $1,800,000 through Emigrant Bank.

## I.    *$2.2 Million Mortgage and Note*

86. In March 2014, Defendants represented Luiza and Natalia in respect of a $2.2 million financing involving Unit 16H.

87.     Defendants drafted, prepared, and/or negotiated a promissory note to Shahriyar Neman ("**Neman**") from Luiza in the amount of $2,200,000 ("**$2.2 Million Note**").

88.     The $2.2 Million Note was secured by a mortgage on Unit 16H that was scheduled to mature in March 2015 ("**$2.2 Million Mortgage**").

89.     Defendants drafted, prepared and/or negotiated the $2.2 Million Mortgage.

90.     The $2.2 Million loan in Luiza's name was at the request of Defendants' client Natalia, who exclusively controlled the disbursement of the $2.2 Million Loan proceeds to her benefit, and Luiza did not receive any disbursement of the proceeds from the $2.2 Million loan.

91.     Defendants failed to protect Luiza's $100,000 equity in Unit 16H in connection with mortgaging Unit 16H for Natalia's $2.2 Million Loan.

92.     Unit 16H was Luiza's primary residence at the time of the $2.2 Million Loan.

93.     Defendants knew that Unit 16H was Luiza's home at that time.

94.     Defendants failed to advise Luiza that Luiza was the sole borrower on the $2.2 Million loan under the $2.2 Million Note and $2.2 Million Mortgage.

95.     Defendants failed to advise Luiza that if Natalia did not pay the $2.2 Million Note, Luiza would be liable with attorney's fees and the foreclosure of Luiza's residence.

96.     Defendants prepared the $2.2 Million loan in Luiza's name but on behalf of Natalia.

97.     Defendants knew at the time they prepared the $2.2 Million loan documents that Natalia was the borrower and that Luiza was not.

98.     Defendants failed to disclose Luiza in the $2.2 Million Note and Mortgage as the nominal borrower for Natalia in respect of the loan, and failed to disclose that no portion of the proceeds were loaned to or intended to be loaned to Luiza.

99.     Luiza as the "borrower" in the $2.2 Million loan documents was a sham.

100.    Defendants instructed Luiza to sign all documents associated with the $2.2 Million loan, including without limitation, the $2.2 Million Note and the $2.2 Million Mortgage.

**J.      *$4.35 Million Guaranty and Collateralized Note***

101.    In May 2014, Defendants represented Luiza and Natalia in a second financing, and instructed, advised, and/or otherwise caused Luiza to sign loan documents, including a personal guaranty, for a $4,350,000 from Daniel Bernstein ("**Bernstein**") and Neman to Natalia though the company NP Holding ("**$4.35 Million Guaranteed Loan**").

102.    The $4.35 Million Guaranteed Loan was further secured by a pledge of all NP Holding's interest in NP Member ("**$4.35 Million NP Holding Pledge Agreement**").

103.    At this time, NP Member still held the 40% Madison 33 Interest.

104.    Defendants drafted, prepared, and/or negotiated the $4.35 Million NP Holding Pledge Agreement and the other documents related to the $4.35 Million Guaranteed Loan.

105.    Defendants failed to tell Luiza at the time they advised her to sign the $4.35 Million Guaranteed Loan documents that if Natalia did not cause NP Holding to repay the $4.35 Million Guaranteed Loan, Luiza would be liable as personal guarantor.

106.    Natalia controlled NP Holding to the exclusion of Luiza at the time the $4.35 Million Guaranteed Loan was made and at all relevant times.

107.    Defendants failed to disclose Luiza in the $4.35 Million Guaranteed Loan documents as the nominal owner of NP Holding, acting in her capacity as the agent for her principal Natalia, that Luiza had no control over the $4.35 Million Guaranteed Loan proceeds.

108.    Defendants knew at the time of closing the $4.35 Million Guaranteed Loan that Luiza had no control over its proceeds.

109.    Defendants knew at the time of closing the $4.35 Million Guaranteed Loan that Natalia controlled its proceeds.

110.    Defendants negotiated the terms and prepared the documents related to the $4.35 Million Guaranteed Loan at Natalia's request to the detriment of their other client, Luiza.

111.    As of June 2014, John emailed CSPC attorney, Barry Schwartz, to determine the best structure for allocating distributions on the 40% Interest so that up to $2.3 million would go to Luiza as a portion of the $3 million in consideration due to Luiza for her services as nominal owner of the 40% Interest and for participating in the Bankruptcy and the JV Closing.

112.    As of June 2014, no portion of the payment due to Luiza for serving as nominee and participating in the Bankruptcy and the JV Closing had been paid.

113.    As of June 2014, John and CSPC failed to advise Luiza that she should receive all or a portion of the $3 million consideration from the proceeds Natalia received on the $4.35 Million Guaranteed Loan to Natalia that Luiza guaranteed and that closed in June 2014.

114.    As of June 2014, eight (8) months after the JV Closing and Luiza's full performance in the JV Closing and in the Bankruptcy, Luiza had not received any portion of her $3 million consideration, nor any documentation prepared by John and CSPC concerning her right to same, and John apparently decreased the amount of the consideration Luiza was to receive on distributions from the 40% Interest from $3 million to $2.3 million, without notice to Luiza; at the same time, Natalia had received $4.35 million secured by the 40% Interest and by Luiza's personal guaranty, plus Natalia also had received $2.2 million secured by Luiza's Unit 16H residence.

**K.    Transfer of 49% of the 40% Madison 33 Interest to FGP**

115.    In or around June 2015, Defendants represented Luiza and Natalia in connection with a $20 million investor transaction related to the 40% Madison 33 Interest.

16

116.    Defendants instructed, advised, counseled, and/or caused Luiza to sign agreements and related documents with FGP 1, LLC ("**FGP**") concerning same.

117.    In the transaction with FGP, 49% of the 40% Madison 33 Interest was assigned to FGP by transferring 49% of the membership interests of NP Holding to FGP ("**FGP Transfer**").

118.    Stated consideration in FGP Transfer was $20 million in cash and assets.

119.    Defendants failed to disclose in the FGP Transfer documents that Luiza was the nominal owner of the 49% interest being transferred to FGP, that Natalia was the principal for whom Luiza held the interest transferred to FGP, and that Natalia was the beneficial owner.

120.    Defendants failed to disclose Natalia in the FGP Transfer documents as the beneficial owner of the 49% interest transferred to FGP and the person who exercised dominion and control over and received and benefited from the proceeds from the FGP Transfer.

121.    Defendants failed to disclose Luiza as the agent for Natalia in the FGP Transfer documents as the nominal owner for transfer purposes, and failed to provide for liability, if any, resulting from the FGP Transfer to be borne by Natalia to the exclusion of the nominal owner, Luiza, in any action or dispute arising out of or related to the FGP Transfer.

122.    Defendants failed to advise Luiza that, as drafted and negotiated, and structured by Defendants and Natalia, Luiza would be liable personally under the FGP Transfer documents for any disputes or claims arising from the Transfer.

123.    Defendants advised Luiza that she would have no personal liability as Natalia's nominee for signing documents related to the FGP Transfer in Luiza's name.

124.    Defendants knew at the time of the FGP Transfer and at all relevant times thereafter, that Natalia was the beneficiary and negotiator of the FGP Transfer, and that Luiza was only the nominee for Natalia in respect of the FGP Transfer.

125. As of June 2015, no portion of the $3 million in consideration due to Luiza for her holding the 40% Interest as nominee and participating in the Bankruptcy and the JV Closing had been paid to Luiza.

126. As of June 2015, John and CSPC knew that Luiza had not received any portion of the $3 million consideration to be paid from distributions or financings on the 40% Interest.

127. As of June 2015, John and CSPC failed to advise Luiza that she could receive all or a portion of Luiza's $3 million consideration from the proceeds Natalia received on the FGP Transfer transacted in Luiza's name.

128. As of June 2015, one year and eight months after the JV Closing and Luiza's full performance in the JV Closing and in the Bankruptcy, Luiza had not received any portion of her $3 million consideration, nor any documentation prepared by John and CSPC concerning her right to same, and John had prepared documents selling half of the 40% Interest to FGP; at the same time, Natalia had received $4.35 million secured by the 40% Interest and by Luiza's personal guaranty, plus Natalia also had received $2.2 million secured by Luiza's Unit 16H residence, plus Natalia had received the right to $20 million in a combination of cash and assets from FGP.

## L.    $1 Million Note to Lee

129. Also in or around June 2015, Defendants instructed, advised, counseled, and/or caused Luiza to sign a $1,000,000 promissory note to Lucky Lee ("**$1 Million Lee Note**").

130. Defendants prepared the $1 Million Lee Note.

131. The $1 Million Lee Note was, according to its terms, secured by *all* of the 40% Madison 33 Interest.

132. Defendants knew at the time they prepared the $1 Million Lee Note and counseled Luiza to sign it, that Luiza could be personally liable upon signing although Natalia got the money.

133.    Defendants failed to disclose Luiza as the nominal borrower for Natalia in the $1 Million Lee Note.

134.    Defendants knew that Natalia (not Luiza) requested the $1 Million Lee Note.

135.    Defendants knew that Natalia was the beneficiary of the $1 Million Lee Note to the exclusion and detriment of Luiza.

136.    Defendants failed to advise Luiza that Luiza could be personally liable on the $1 Million Lee Note if Natalia did not repay the proceeds.

137.    John and CSPC failed to protect Luiza's interest in the $3 million consideration Luiza was to receive from financings or distributions on the 40% Interest in connection with the proceeds from the $1 Million Lee Note, which was apparently secured by Natalia's 40% Interest in the 172 Madison Real Estate Project according to the terms of the Note.

138.    The $1 Million Lee Note was to be repaid, according to its terms, with proceeds from distributions on the 40% Madison 33 Interest.

139.    Defendants failed to reduce to a writing with Lee, that liability resulting from the $1 Million Lee Note, if any, would be to Natalia to the exclusion of Luiza, in any action or dispute arising out of or related to the $1 Million Lee Note.

**M.    $ 1 Million Note to Goldberg**

140.    Also in June 2015, Defendants instructed, advised and/or otherwise caused Luiza to sign a $1,000,000 promissory note to Denis Goldberg ("**$1 Million Goldberg Note**").

141.    The $1 Million Goldberg Note was prepared by Defendants.

142.    The $1 Million Goldberg Note was, according to its terms, secured by all of the 40% Interest in the 172 Madison Real Estate Project.

143.    Defendants knew at the time they prepared the $1 Million Goldberg Note and instructed Luiza to sign it, that Luiza could be personally liable for the $1 Million Goldberg Note even though the money was lent to Natalia.

144.    Defendants failed to disclose Luiza as the nominal borrower for Natalia in the terms of the $1 Million Goldberg Note.

145.    Defendants knew at the time the $1 Million Goldberg Note was made that Natalia (not Luiza) requested the $1 Million Goldberg Note.

146.    Defendants, at the time the $1 Million Goldberg Note was made, knew that Natalia was the intended beneficiary of the $1 Million Goldberg Note to the exclusion of Luiza.

147.    Defendants failed to advise Luiza that Luiza could be personally liable on the $1 Million Goldberg Note if Natalia did not repay the money.

148.    Defendants failed to protect Luiza's interest in the $3 million consideration Luiza was to receive from distributions and financings on the 40% Interest in connection with the proceeds from the $1 Million Goldberg Note, which was apparently secured by the 40% Interest in the 172 Madison Real Estate Project according to the terms of the $1 Million Goldberg Note.

149.    The $1 Million Goldberg Note was to be repaid, according to its terms, with proceeds from distributions on the 40% Interest.

150.    Defendants failed to reduce to a writing with Goldberg that liability resulting from the $1 Million Goldberg Note, if any, would be to Natalia to the exclusion of Luiza in any action or dispute arising out of or related to the $1 Million Goldberg Note.

N.    *$2 Million Note to Belkhoroev*

151.    Also in June 2015, Defendants instructed, advised, counseled, and/or caused Luiza to sign a $2,000,000 promissory note to Mikhail Belkhoroev ("**$2 Million Belkhoroev Note**").

152.    The $2 Million Belkhoroev Note was prepared by Defendants.

153.    The $2 Million Belkhoroev Note was, according to its terms, secured by all of the 40% Interest in the 172 Madison Real Estate Project.

154.    The $2 Million Belkhoroev Note was for the benefit of Natalia.

155.    Defendants knew at the time they prepared the $2 Million Belkhoroev Note and instructed Luiza to sign it, that Luiza could be personally liable for the $2 Million Belkhoroev Note even though all money was lent to Natalia.

156.    Defendants failed to disclose Luiza as the nominal borrower for Natalia in the terms of the $2 Million Belkhoroev Note.

157.    Defendants knew at the time of the $2 Million Belkhoroev Note that Natalia (not Luiza) requested the $2 Million Belkhoroev Note.

158.    Defendants knew, at the time the $2 Million Belkhoroev Note was made, that Natalia was the intended beneficiary of the $2 Million Belkhoroev Note to the exclusion of Luiza.

159.    Defendants failed to advise Luiza that Luiza would be personally liable on the $2 Million Belkhoroev Note if Natalia did not repay the proceeds.

160.    Defendants failed to protect Luiza's interest in the $3 million consideration Luiza was to receive from distributions and financings on the 40% Interest in connection with the proceeds from the $2 Million Belkhoroev Note, which was apparently secured by the 40% Interest in the 172 Madison Real Estate Project according to the terms of the $2 Million Belkhoroev Note.

161.    The $2 Million Belkhoroev Note was to be repaid, according to its terms, with proceeds from distributions on the 40% Interest.

162.    Defendants failed to reduce to a writing with Belkhoroev, that liability resulting from the $2 Million Belkhoroev Note, if any, would be to Natalia to the exclusion of Luiza in any action or dispute arising out of or related to the $2 Million Belkhoroev Note.

163.    As of June 2015, Luiza had not received any of the $3 million due from distributions or financings on the 40% Madison 33 Interest, nor had Defendants finalized any documentation concerning Luiza's right to same or the concerning the Material Considerations.

164.    On the other hand, as of June 2015, Defendants had prepared the above-financings and transactions in Luiza's name and whereby Natalia took millions of dollars as the beneficiary of the FGP Transfer, the $4.35 Million Loan, the $2.2 Million Loan, the $1 Million Lee Note, the $1 Million Goldberg Note, and the $2 Million Belkhoroev Note – secured by Luiza's residence, her personal guaranty, or the 40% Interest from which Luiza was to receive payment but did not.

### O.    $2.2 Million Mortgage and Note Forbearance

165.    In July 2015, Defendants advised, instructed, counseled, and/or caused Luiza to sign an agreement with the lender on the $2.2 Million Loan ("**2015 Forbearance Agreement**") to extend the maturity date of the $2.2 Million Loan and discontinue a pending foreclosure action.

166.    Natalia had defaulted on the $2.2 Million Loan by failing to repay the $2.2 Million by its maturity date and the lender had commenced foreclosure on Luiza's Unit 16H residence.

167.    Defendants negotiated and prepared the terms of the 2015 Forbearance Agreement, jointly and/or with counsel for the $2.2 Million Loan lender.

168.    Defendants gave legal representation to Natalia and Luiza in connection with the 2015 Forbearance Agreement, but failed to adequately protect Luiza's interests or to advise Luiza of her rights.

169.     The 2015 Forbearance Agreement caused Luiza to waive any and all defenses she had to the enforcement of the $2.2 Million Loan as against her, including, that she was not the borrower and was the disclosed agent of Natalia.

170.     Natalia negotiated the $2.2 Million Loan directly with the lender.

171.     The $2.2 Million Loan lender knew Luiza was not the borrower, that Natalia was the in-fact borrower, and that Luiza was nominal only.

172.      Defendants knew Natalia negotiated the $2.2 Million Loan directly with the lender.

173.     Defendants knew that the $2.2 Million Loan lender said that Luiza was not the borrower, that Natalia was the in-fact borrower, and that Luiza was the nominal borrower.

174.     Nevertheless, Defendants advised, counseled, instructed, and/or caused Luiza to sign the 2015 Forebearance Agreement, waiving all defenses Luiza had or may have against the $2.2 Million Loan lender in any subsequent proceeding on the $2.2 Million loan.

175.     Defendants failed to advise Luiza when instructing her to sign the 2015 Forbearance Agreement that Luiza was waiving her rights to challenge the validity of the debt as against her, and that she was waiving all claims she might have against the lender.

176.     Defendants, continually conflicted by their service to Natalia, failed to secure or negotiate any benefit to Luiza in her signing the 2015 Forbearance Agreement, including, that Natalia could have paid Luiza the then-current value of Luiza's equity in Unit 16H, or provided other protections to secure to Luiza the value of Luiza's equity in Unit 16H at the time of the 2015 Forbearance Agreement.

177.     The 2015 Forbearance Agreement extended the payment date on the $2.2 Million Loan to January 2016.

### P.    Transfer to MIC of the Same 49% Interest Previously Transferred to FGP

178.    In November 2015, Defendants represented Luiza and Natalia in connection with another multimillion-dollar transaction concerning the 40 % Interest.

179.    Defendants negotiated on behalf of Natalia with counsel for M Investment Capital, LLC ("**MIC**") to transfer to MIC the same 49% interest previously sold to FGP in the FGP Transfer, plus an option for MIC to acquire the remaining 51% of the membership interest in NP Holding if MIC paid off the $4.35 Million Guaranteed Loan ("**MIC Transfer**").

180.    Consideration for the MIC Transfer was $5 million cash and the payoff amount of the $4.35 Million Guaranteed Loan, plus, MIC was to reimburse FGP the amount of the value of any consideration FGP actually transferred to Natalia in the FGP Transfer.

181.    In November 2015, Defendants advised, instructed, counseled, and/or caused Luiza to sell to MIC the same 49% interest that Defendants previously advised, instructed, counseled, and/or caused Luiza to assign to FGP in the FGP Transfer.

182.    This was done without a waiver from FGP or any other acknowledgment from FGP that FGP consented to the MIC Transfer.

183.    In exchange for the 49% interest in NP Holding that was transferred to MIC in the MIC Transfer, Natalia received $5 million in cash.

184.    Natalia was the intended beneficiary of the MIC Transfer.

185.    Luiza was the nominal counterparty in the MIC Transfer on behalf of Natalia.

186.    Defendants knew that Luiza was the nominal counterparty in the MIC Transfer.

187.    Defendants negotiated or prepared the MIC Transfer documents for Natalia.

188.    Defendants knew that the consideration to be paid under the MIC Transfer was to be paid to Natalia or was otherwise under Natalia's dominion and control.

24

189.    Defendants knew that none of the $5 million in consideration for the 49% interest transferred to MIC was controlled by Luiza for Luiza's benefit or consideration.

190.    Defendants failed to advise Luiza that the resale to MIC of the same 49% interest FGP received in the FGP Transfer could result in liability to Luiza under the FGP Transfer documents, including the incursion of defense costs and FGP's attorney's fees and costs in any lawsuit by FGP against Luiza arising out of or related to the FGP Transfer.

191.    Defendants failed to disclose Luiza in the MIC Transfer documents as the nominal owner of the 49% interest being transferred to MIC and failed to disclose Natalia as the beneficial owner and principal in respect of the interest being transferred.

192.    Defendants failed to advise Luiza that the 49% transferred to MIC in the MIC Transfer was the same 49% Natalia previously sold to FGP in Luiza's name in the FGP Transfer and that Luiza could be responsible for double selling the interest.

193.    Luiza did not know the terms of the MIC Transfer.

194.    Luiza only signed the MIC Transfer documents prepared by Defendants and negotiated by them and Natalia, at Natalia's request.

195.    Defendants knew at the time of the MIC Transfer that Luiza had not received any of the $3 million which was to come from financings or distributions on the 40% Interest.

196.    No more than 49% of the 40% Interest could be sold without approval from a construction lender who held a $100 million mortgage on the Madison 33 Property.

197.    Defendants discussed this fact openly in email correspondence negotiating with MIC's counsel for the MIC Transfer.

198.    Therefore, only the same 49% previously transferred to FGP could be sold to MIC without the construction lender's approval, which was not received nor even requested by

Defendants, because the same 49% of NP Holding was being resold to MIC that was previously sold to FGP in the FGP Transfer.

199.    If MIC exercised its option under the MIC Transfer for the remaining 51% interest, it would render Luiza unable to recover the $3 million consideration from financings or distributions on NP Holding's 40% Interest.

200.    As of November 2015, approximately two years after the JV Closing and Luiza's full performance in the JV Closing and, in the Bankruptcy, Luiza had not received any portion of the $3 million consideration from distributions or financings on the 40% Interest, nor had Defendants finalized any documentation concerning it or the Material Considerations.

201.    On the other hand, Defendants, concurrently representing Natalia, prepared the above transactions and financings whereby Natalia received millions of dollars in consideration as the beneficiary of the FGP Transfer, the $4.35 Million Loan, the $2.2 Million Loan, the $1 Million Lee Note, the $1 Million Goldberg Note, the $2 Million Belkhoroev Note, and the MIC Transfer – each in Luiza's name and/or secured by Luiza's residence, her personal guaranty and/or NP Holding's 40% Madison 33 Interest.

## Q.    *Purported Cancellation of the FGP Transfer*

202.    In December 2015, Defendants, purportedly on behalf of Luiza, caused Luiza to attempt to terminate the FGP Transfer on the basis that FGP failed to provide sufficient non-cash consideration to satisfy the $20 million price for the FGP Transfer.

203.    Defendants knew at the time they caused Luiza to terminate the FGP Transfer that the transfer of the 49% interest in NP Holding had already occurred and could not be "terminated."

204.    Defendants knew at the time that they caused Luiza to terminate the FGP Transfer that the 49% interest transfer was not rescinded or able to be resold to MIC.

26

205.    Nevertheless, Defendants issued a December 2015 termination letter to FGP in Luiza's name at the request of Natalia.

206.    Defendants issued the December 2015 termination letter to FGP because Natalia asked them to, as Natalia sought immediate cash or assets to quickly liquidate, and believed same could be obtained from MIC.

207.    Natalia asserted that of the $20 million promised by FGP, Natalia only received several million and one apartment valued at $2 million, leaving Natalia without approximately $15 million she was promised out of the $20 million in consideration from FGP.

208.    Defendants counseled, advised, or instructed Luiza to terminate the FGP Transfer in December 2015 at the request of Natalia.

209.    Defendants were representing Natalia's interests in instructing Luiza to terminate the FGP Transfer in December 2015.

210.    Defendants were representing Luiza's interests in instructing Luiza to terminate the FGP Transfer in December 2015.

211.    Defendants neglected to provide competent legal representation of Luiza's interests in advising Luiza to terminate the FGP Transfer in December 2015.

**R.      A Second $2.2 Million Mortgage and Note Forebearance**

212.    In or around January 2016, Defendants instructed, advised, counseled, or caused Luiza to enter into a second forbearance agreement with the lender of the $2.2 Million Loan ("**2016 Forbearance Agreement**").

213.    The 2016 Forbearance Agreement modified the 2015 Forbearance Agreement.

214.     The 2016 Forbearance Agreement extended the maturity date to December 31, 2016 and assigned the $2.2 Million Loan to Bernstein, who was the preexisting co-lender on the $4.35 Million Guaranteed Loan.

215.     All other terms of the initial 2015 Forbearance Agreement remained, including that Luiza waived all defenses to the lender's enforcement of the $2.2 Million Loan as against her.

216.     Defendants, conflicted by their service to Natalia, failed to secure or negotiate any benefit to Luiza in her signing the 2016 Forbearance Agreement, including, that Natalia could have paid Luiza the then-current value of Luiza's equity in Unit 16H, or provided other protections to secure to Luiza the value of Luiza's equity in 16H at the time of the 2016 Forbearance Agreement.

## S.     *FGP Lawsuit Against Luiza*

217.     In January 2016, FGP sued Luiza concerning the 49% interest transferred to FGP and then resold to MIC ("**FGP Litigation**").

218.     FGP sought a declaratory judgment that it owned 49% of NP Holding, that it had a right of first refusal for the remaining 51% interest under the operating agreement to which it was a party for NP Holding, attorney's fees and costs, and for damages in lieu of the declaratory relief and/or for losing the option to acquire the remaining 51% interest.

219.     Defendants represented Luiza in the FGP Litigation.

220.     Luiza fired Defendants from representing her in the FGP Litigation in June 2017.

## T.     *Purported Nominee Agreement*

221.     In January 2016, Defendants prepared a document titled "Nominee Agreement" ("**Purported Nominee Agreement**") at Natalia's request to them to prepare same.

222.     The Purported Nominee Agreement has no date on it indicating when it was signed but its effective date is set forth as "December 2013."

28

223. In January 2016, Defendants advised, counseled, instructed, and/or caused Luiza to sign the Purported Nominee Agreement under advice and counsel as Luiza's attorneys.

224. The Purported Nominee Agreement's only correct recitation of the arrangement between Natalia and Luiza regarding Luiza as nominal owner of NP Holding is that it acknowledges Natalia as the exclusive owner and controller of the 40% Interest, all proceeds from financings or distributions in respect of the 40% Interest, and Natalia's liability as to any injury to Luiza sustained from loans on or sales of the 40% Interest.

225. Defendants failed to accurately recite or reduce to a writing in the Purported Nominee Agreement the remainder of the arrangement as to Luiza's performance as the nominal owner of the 40% Interest, including the $3 million and other Material Considerations.

226. The Purported Nominee Agreement referenced, as consideration for Luiza's performance as nominee, only mutual covenants and undertakings of the parties, omitting reference to the $3 million due to Luiza, $2.3 million of which Defendants were structuring to come to Luiza from distributions on the 40% Interest, and none of which could be realized anymore, because at the time Defendants presented the Purported Nominee Agreement to Luiza in January 2016 to sign, Defendants had already counseled and assisted Natalia in liquidating the entire 40% Interest in transactions with FGP, MIC, Lee, Goldberg, Belkhorev, and Bernstein.

227. After failing to include any recitation as to the $3 million due to Luiza in the Purported Nominee Agreement, Defendants further deprived Luiza of her $3 million by drafting the Purported Nominee Agreement to contain a merger clause, which would work against parol evidence of the existence of the full terms of the arrangement, including payment to Luiza.

228.    Further, Defendants falsely drafted in the Purported Nominee Agreement that Luiza entered into the Agreement freely and voluntarily with opportunity to consult separate counsel of her choice as to the terms in the Agreement before signing it.

229.    John and Natalia had called Luiza to go to John's office without telling her why, and when Luiza arrived, John and Natalia seated Luiza in a conference room with themselves and placed the Purported Nominee Agreement in front of Luiza and told Luiza to sign the Purported Nominee Agreement.

230.    John told Luiza that the Purported Nominee Agreement recited that Natalia was the lawful owner of the 40% Interest in NP Holding and to sign the document to protect Natalia in case something happened to Luiza.

231.    John failed to advise Luiza as to the full terms of the Purported Nominee Agreement and as to Luiza's rights against Natalia in connection with Luiza's services to Natalia thus far as the nominal owner of NP Holding.

232.    Defendants had a non-waivable conflict of interest in connection with the Purported Nominee Agreement and in connection with serving as attorneys for Luiza and to Natalia since the July 2013 Engagement.

233.    The Purported Nominee Agreement was the penultimate misconduct and breach of Defendants' fiduciary obligations to Luiza as her attorneys.

## U.    *Natalia Abandonment of Luiza*

234.    Immediately after the January 2016 meeting at Defendants' office, Natalia began distancing herself from Luiza.

235.    The last communication Luiza had with Natalia was on or about April 2016, when Luiza called Natalia to tell her that Luiza arrived in New York from Moscow, as she had been in Moscow on assignment for Natalia; Natalia replied that she was leaving the United States.

236.    Luiza thereafter continued paying various of Natalia's debts, some in Luiza's name and others in Natalia's name, waiting for Natalia to resurface and reconnect with Luiza.

237.    When Luiza would ask John if John had heard from Natalia during this time, John would lie to Luiza and tell Luiza he had not.

238.    Luiza never spoke with Natalia again.

## V.    *Bernstein Lawsuit Against Luiza*

239.    By December 2016, the lender of the $4.35 Million Guaranteed Loan to Natalia, which was secured by all of NP Holding's interest in NP Member and personally guaranteed by Luiza, sued Luiza as guarantor to recover the principal and other damages as the Loan had matured and was unpaid ("**Bernstein $4.35 Million Litigation**").

240.    Defendants represented Luiza in the Bernstein $4.35 Million Litigation.

241.    In February 2017, MIC exercised its option under the MIC Transfer and paid the payoff amount of the $4.35 Million Guaranteed Loan.

242.    It was in MIC's self-interest to do so since the $4.35 Million Guaranteed Loan was secured by a pledge of all NP Holding's interest in the 40% Madison 33 Interest.

243.    MIC asserts that it acquired the remaining 51% of the 40% Interest as a result of paying off the $4.35 Million Guaranteed Loan.

244.    Defendants represented Luiza in connection with MIC's payment to the lender of the $4.35 Million Guaranteed Loan.

245.    Defendants represented Natalia in connection with MIC's payment to the lender of the $4.35 Million Guaranteed Loan.

246.    Natalia, or others on her behalf, paid the attorney fees for Defendants regarding MIC's payment to the lender of the $4.35 Million Guaranteed Loan.

247.    Luiza still had no communication from Natalia at this time in February 2017.

## W.    *FGP Lawsuit Against John, CSPC, and Natalia*

248.    In February 2017, FGP sought leave to add claims against John in the FGP Litigation for fraud and aiding and abetting Natalia and Luiza, as well as to add claims against Natalia.  Defendants kept representing Luiza in opposing FGP's motion.

249.    Defendants told Luiza at this time that if the Court granted FGP's motion for leave to add them as co-defendants, they would only then have a non-waivable conflict of interest.

250.    This is the only time John told Luiza to seek independent counsel to represent her.

251.    Other than in connection with the FGP Litigation, Defendants never told Luiza she should obtain independent counsel.

252.    Defendants never counseled Luiza at any time to seek independent counsel in any of the other litigations, transactions, or financings involving Luiza and Natalia.

## X.    *Bernstein Second Lawsuit Against Luiza*

253.    Just one month later, in March 2017, the same lender of the $4.35 Million Guaranteed Loan who acquired the $2.2 Million Mortgage (Bernstein), commenced a foreclosure action against Luiza ("**Foreclosure Action**").

254.    The Foreclosure Action was to auction Luiza's Unit 16H residence due to Natalia's failure to repay the $2.2 Million Loan by the extended December 31, 2016 maturity date under the 2016 Forbearance Agreement.

32

255.    Luiza still had no contact with Natalia or knowledge of her whereabouts.

256.    Upon information and  belief, Defendants were still in contact with and being compensated by Natalia or persons on her behalf.

### Y.    *March 2017 Engagement*

257.    At the same time in March 2017, Defendants entered into an engagement agreement with Luiza ("**March 2017 Engagement**") pertaining to Luiza's only other property, unit 5-I ("**Unit 5-I**") condominium located at 220 Riverside Blvd. in New York, New York.

258.    Since 2008, the parents of Mermelstein (who had referred the 172 Madison Real Estate Project business to Defendants) had been residing in Unit 5-I.

259.    Mermelstein's parents' tenancy in Unit 5-I was payment to Mermelstein of a $1 million debt that Natalia owed to Mermelstein for legal services.

260.    Since 2008, Mermelstein or his parents paid the monthly maintenance on Unit 5-I, but they did not pay the mortgage on Unit 5-I.

261.    Neither Mermelstein, his parents, nor any designee of Mermelstein or his parents obtained deeded title to Unit 5-I in 2008.

262.    Prior to relocating to Unit 16H, Unit 5-I was Luiza's primary residence, which Luiza had acquired before she knew Natalia.

263.    Luiza had a mortgage on Unit 5-I ("**220 Riverside Mortgage**") at the time Mermelstein's parents occupied in Unit 5-I.

264.    Neither Mermelstein nor his parents paid the mortgage from 2008 to 2017.

265.    In 2017, Luiza was unable to continue paying the 220 Riverside Mortgage.

33

266.    As of 2017, Luiza had spent her savings and liquidated other assets to pay Natalia's debts since in or around 2014 when Natalia told Luiza she had some financial troubles, and throughout Natalia's abandonment of Luiza in 2016.

267.    In 2017, the lender on the 220 Riverside Mortgage was going to foreclose and auction Unit 5-I for non-payment.

268.    As a result, Mermelstein wanted to transfer the deed to Unit 5-I to his or his designee's name, and to pay the balance of the 220 Riverside Mortgage.

269.    Luiza did not owe a debt to Mermelstein.

270.    Mermelstein had no legal rights to Luiza's Unit 5-I.

271.    Mermelstein did not offer to pay Luiza for any portion of the approximate $500,000 of equity Luiza had in Unit 5-I in connection with his request for Luiza to transfer the 5-I deed.

272.    Mermelstein had no contract with Luiza to transfer the deed of Unit 5-I to him or to his designee prior to Defendants' representation of Luiza in 2017 as to Unit 5-I.

273.    Any contract Mermelstein had with Luiza for the transfer of the deed of Unit 5-I to him or to his designee arose from Defendants' representation of Luiza in March 2017.

274.    Defendants failed to advise Luiza that Luiza could sell Unit 5-I for a market price in order to preserve her approximate $500,000 equity and to satisfy the lender out of the proceeds.

275.    Defendants were continuing to serve Natalia's and/or Mermelstein's interest in Defendants' representation of Luiza under the March 2017 Engagement in ensuring Luiza's Unit 5-I was used to satisfy Natalia's debt to Mermelstein and/or to satisfy Mermelstein.

276.    Defendants counseled, advised, instructed, and/or caused Luiza to transfer the deed to Unit 5-I to Mermelstein or his designee in March 2017.

277.    That transfer gave no consideration to Luiza.

278.    As a result, Luiza lost all her equity in Unit 5-I.

## Z.    Termination of Defendants as Luiza's Attorneys

279.    In June 2017, Luiza retained independent counsel and terminated correspondence with Defendants as to all representative matters.

## AA.    MIC Lawsuit Against Luiza

280.    In February 2018, MIC sued Luiza and FGP ("**MIC Litigation**").

281.    MIC seeks declaratory relief as to its alleged 100% ownership of the 40% Interest, damages against Luiza for attorney's fees and costs, and if declaratory relief is denied, damages against Luiza in the amount of the cash and other consideration given to Natalia.

282.    The MIC Litigation was and remains consolidated with the FGP Litigation.

## BB.    Natalia's Resurfacing

283.    Also in February 2018, a foreign recognition proceeding by a Russian commercial bank commenced against Natalia in the Bankruptcy Court for the Southern District of New York for recognition of a Russian bankruptcy judgment in the approximate amount of $21 million resulting from a Russian bankruptcy that initiated against Natalia and some of her companies in Russia in 2015 ("**Foreign Recognition Proceeding**").

284.    As a result of Luiza being served with such notice, Luiza's counsel had contact with Natalia's attorney who appeared in the proceeding on Natalia's behalf.

285.    This was the first instance of Luiza having any knowledge that Natalia was even alive after Natalia's abandonment of Luiza in April 2016.

286.    At no time prior to the Foreign Recognition Proceeding was Luiza aware of an alleged 2015 Russian bankruptcy against Natalia.

35

## CC.    Unit 16H Foreclosure

287.    In 2019, as a result of Luiza's waiver of all defenses as to the $2.2 Million Loan in the 2015 and 2016 Forbearance Agreements, her Unit 16H home was foreclosed and sold at auction ("**16H Foreclosure**").

288.    Luiza's defenses in the 16H Foreclosure were precluded by the 2015 Forbearance Agreement and the 2016 Forebearance Agreement in which Luiza waived all affirmative defenses in exchange for an extension of time for Natalia to repay the $2.2 Million Loan.

289.    On appeal of 16H Foreclosure judgment, the Appellate Division held that Luiza's "affirmative defenses, however, are precluded by a forbearance agreement in which defendant waived any affirmative defenses in exchange for, *inter alia*, an extension of time to repay the loan. Moreover, Supreme Court correctly refused to deny the motion as premature pursuant to CPLR 3212(f); because the affirmative defenses are precluded, no discovery could lead to facts that would warrant the denial of plaintiff's summary judgment motion."

290.    Moreover, in 2021, a judgment was entered against Luiza in the 16H Foreclosure for the lender's attorney's fees and costs in the amount of $165,000.

291.    As a result of the 16H Foreclosure, Luiza lost all equity she held in Unit 16H, which was $100,000 in 2008 and approximately $300,000 in 2019.

292.    She also became homeless and has since resided with acquaintances and relatives.

293.    As a 75-year-old single woman who has lost all her savings and other assets due to Defendants' and Natalia's misconduct, she cannot even afford rent with her social security income.

## DD.    Goldberg and Lee Lawsuit Against Luiza on the Promissory Notes

294.    Also in 2019, Lee and Goldberg sued Luiza ("**Lee-Goldberg Litigation**").

295.    The Lee-Goldberg Litigation alleges fraud and non-payment under the secured unperfected promissory notes signed by Luiza for the benefit of Natalia under the advice and counsel of Defendants, totaling $5 million.

296.    The Belkhoroev $2 million Note was assigned to Goldberg, who already held the $1 Million Goldberg Note, and Lee held the $1 Million Lee Note.

297.    Goldberg and Lee named Defendants and Natalia in the Lee-Goldberg Litigation.

## EE.    *Russian Bank Lawsuit Against Luiza*

298.    In February 2021, the Russian bank that sued Natalia in the Foreign Recognition Proceeding, which was dismissed, commenced a New York State recognition proceeding and a fraudulent conveyance action against Luiza in New York Supreme Court ("**Russian Bank Litigation**").

299.    The Russian Bank seeks the $21 million debt of Natalia by obtaining the 40% Interest or, failing that, damages from Luiza and others.

300.    The Russian Bank alleges Luiza was Natalia's alter ego and assisted in defrauding the Russian Bank creditor by serving as Natalia's nominee regarding the 40% Interest in the 172 Madison Real Estate Project.

301.    The First Department Appellate Division has sustained the allegations of actual and constructive fraud alleged by the Russian Bank.

302.    Defendants are not named parties in the Russian Bank Litigation.

## FF.    *Current Status of Matters*

303.    FGP received partial summary judgment on the FGP Transfer with a declaratory judgment entered and finding that FGP received a transfer of a 49% interest in NP Holding.

304.    The Lee-Goldberg Litigation is joined for discovery and trial with the FGP Litigation and the MIC Litigation.

305.    Discovery is closed in the Lee-Goldberg Litigation, MIC Litigation, and FGP Litigation, and Notes of Issue and final summary judgment motions are to be filed in the coming months.

306.    The Russian Bank Litigation is pending and in the discovery stage.

**MALPRACTICE / NEGLIGENT
REPRESENTATION / BREACH OF FIDUCIARY DUTY**

307.    Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein and further alleges as follows.

308.    The elements of a cause of action for legal malpractice are (1) the existence of an attorney-client relationship creating a duty of care by the attorney, (2) the breach of that duty by the attorney, and (3) proximate causation of the damages claimed by the attorney's client.

309.    When an attorney or law firm violates one of the Rules of Professional Conduct, this has essentially the same status and function in a malpractice action as a statute that prescribes a standard of conduct has in a negligence action; its breach is evidential of a defendant's failure to comply with the required standard of care.

310.    In this case, Defendants committed multiple acts of malpractice that injured Luiza and caused her damages.

*A.    Concurrent Adverse Representation*

311.    Under the New Jersey Rules of Professional Conduct: "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another

client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer."  N.J. Rules Professional Conduct ("NJ-RPC") R. 1.7.

312.   Defendants committed legal malpractice due to their concurrent representations of Natalia and Luiza's adverse interests.

313.   Defendants concurrently represented Natalia and Luiza with knowledge of Natalia's creditors and of the purpose and use of Luiza as Natalia's shield to proof Natalia and Natalia's assets from judgment collection at the expense of the exposure of Luiza to foreseeable and certain liability and economic injury.

314.   Defendants concurrently represented Natalia and Luiza with knowledge of and substantial participation in Natalia's liquidation of the 40% Madison 33 Interest.

315.   This liquidation was to the exclusion of Luiza's interest in the $3 million consideration Luiza was to receive from distributions or financings on the 40% Interest.

316.   Defendants concurrently represented both Natalia and Luiza with knowledge of Natalia's inability to repay and/or intent to default on the loans in Luiza's name, taken for the benefit of Natalia and by Defendants' substantial assistance while they were Luiza's attorneys.

317.   Defendants concurrently represented Natalia and Luiza with knowledge of Luiza's interest in being disclosed as Natalia's agent and nominee regarding the 40% Interest, and of Natalia's adverse interest in not being disclosed as the beneficial owner of the 40% Interest.

318.   Defendants violated NJ-RPC Rule 1.7 by concurrently representing Luiza and Natalia as to representative matters falling under the July 2013 Engagement, the August 2013

Engagement, the March 2014 Engagement, and the March 2017 Engagement, and specifically in respect of:

    a.  the Bankruptcy;

    b.  the formation and organization of Natalia's eponymous NP companies;

    c.  the Equity Preservation Plan and Bankruptcy Plan; and

    d.  the JV Closing.

319.    Due to Defendants' conflict to Luiza due to their concurrent representation of Pirogova's adverse interests, Defendants failed to adequately represent Luiza in these matters.

320.    Defendants failed to advocate or provide for a writing to ensure protection and payment of the $3 million consideration to Luiza and also, to ensure protections for Luiza as the nominal owner of the 40% Interest after the JV Closing and constructive or actual transfer of all beneficial interest therein to Natalia while Luiza remained in nominal title.

321.    Defendants' representation of Natalia was directly adverse to Luiza's interest in Defendants' representation of Luiza in matters arising under the July 2013 Engagement, the August 2013 Engagement, the March 2014 Engagement, and the March 2017 Engagement, and specifically in respect of:

    a.  the occurrence of Bankruptcy, formation and organization of the NP companies, the Equity Preservation Plan, Bankruptcy Plan, and the JV Closing without the existence of a contemporaneous writing or other mechanism concerning the $3 million payment and other Material Considerations and protections for Luiza as the nominal owner after the JV Closing and constructive or actual transfer of all beneficial interest in the 40% Interest to Natalia;

    b.  the $2.2 Million Note and Mortgage;

    c.  the Forbearance Agreements;

    d.  the Goldberg, Lee, and Belkhoroev Promissory Notes;

    e.  the FGP Transfer;

    f.  the MIC Transfer; and

    g.  the Unit 5-I transfer to Mermelstein.

322.    Defendants could not competently and diligently represent Luiza in these matters because the best interests of Luiza did not align with the interests of Natalia in these matters or Defendants' allegiance to Natalia's interests in these matters.

323.    In no manner could these clients' interests align where Natalia was apparently and actively with the assistance of Defendants defrauding Luiza.

324.    In connection with these matters, Natalia was defrauding Luiza (and others) with the substantial assistance of Defendants.

325.    With knowledge of this, Defendants continued to concurrently represent Luiza and Natalia in these matters for the benefit of Natalia and to the detriment of Luiza.

326.    Luiza never provided Defendants with informed consent after meaningful and full disclosure to concurrently represent Luiza and Natalia in these matters.

327.    Defendants knew Luiza's and Natalia's interests were adverse and attempted only to protect Natalia and themselves from liability while billing significant sums in attorney's fees and exposing Luiza to foreseeable financial harm.

328.    Defendants' conflict of interest in continuing to attempt to represent Natalia while also representing Luiza harmed Luiza because John used his representation of Luiza to shield Natalia, and Natalia liquidated her interests (several times over) in Luiza's name with no intent to settle or repay the monies she received as loans in Luiza's name.

329.    Defendants' concurrent representation of Luiza and Natalia was calculated to protect Natalia to Luiza's detriment.

330.    By representing Natalia while representing Luiza in these matters, Defendants failed to represent Luiza and her interests competently and diligently in these matters.

**B.      *Failure to Abide the Client's Decisions***

331.    Under Rule 1.2 of the Rules of Professional Conduct, "[a] lawyer shall abide by a client's decisions concerning the scope and objectives of representation." NJ-RPC, R. 1.2.

332.    Defendants committed malpractice by disregarding Luiza's directives concerning the representative matters.

333.    Luiza told John to reduce to a writing the nominal status of Luiza as to the 40% Interest in the 172 Madison Real Estate Project.

334.    Despite this, Defendants failed to timely reduce to a written document the nominal status of Luiza as to the 40% Interest.

335.    Defendants failed to do so because they were serving the interests of their other client, Natalia, in keeping the nominee arrangement undisclosed from writing at all relevant times.

336.    By not abiding Luiza's choice to have her nominal capacity in respect of the 40% Interest timely reduced to a writing, Defendants violated NJ-RPC Rule 1.2.

337.    Had they abided her choice, Luiza would have been able to ensure all investors and others that transacted with Natalia in Luiza's name had no basis to assert damages against Luiza was an agent of a disclosed principal.  Because this did not occur, they all claim that they did not know, and that Natalia was not disclosed, and that they dealt with Luiza, which is a lie.

## C.    *Failure to Diligently Represent*

338.    Rule 1.3 of the Rules of Professional Conduct requires a lawyer to "act with reasonable diligence and promptness in representing a client."  NJRPC, R. 1.3.

339.    Defendants failed to diligently represent Luiza because they did not act in Luiza's interest but acted in and for the effectuation of Natalia's adverse interests.

340.    Defendants failed to zealously represent Luiza in the representative matters arising under the July 2013 Engagement, the August 2013 Engagement, the March 2014 Engagement, and the March 2017 Engagement, as Defendants took instructions from only one of its two clients, Natalia, and applied those decisions and instructions to Luiza without regard for Luiza's interests.

341.    As part of their duty to represent Luiza with reasonable diligence, Defendants, as counsel for Luiza, were required to notify Luiza of Natalia's apparently fraudulent behavior.

342.    Even if Defendants were not actively aware of Natalia's fraud, which they were, Defendants owed a fiduciary duty to Luiza to advise Luiza of Natalia's suspicious conduct, *i.e.*, conduct that would have raised caution to an attorney representing Luiza's interests in the matters.

343.    Instead, Defendants acted solely for Natalia's benefit concerning the representative matters, and failed to inform, advise, counsel, and/or warn Luiza of Natalia's apparent fraudulent conduct which was foreseeable as detrimental to Luiza.

344.    Defendants used their position of trust and confidence as Luiza's attorneys and advisors to conceal Natalia's fraudulent conduct from Luiza.

345.    For these reasons, and the reasons set forth in greater detail herein, Defendants violated Rule 1.3 by failing to represent Luiza diligently.

346.    As a direct and proximate result, Luiza has sustained significant injuries related to the representative matters.

## D.      *Breach of Fiduciary Duty*

347.    A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship.

348.    The fiduciary's obligation to the dependent party includes a duty of loyalty and a duty to exercise reasonable skill and care.

349.    The fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship.

350.    An attorney owes a fiduciary duty toward his or her client.

351.    An attorney's breach of fiduciary duty to a client constitutes malpractice.

352.    Defendants committed malpractice by breaching their fiduciary duty to Luiza.

353.    Defendants owed fiduciary obligations to Luiza.

354.    As Defendants were serving as Luiza's attorney, they owed a fiduciary duty to Luiza in respect of the representative matters, including those arising under the July 2013 Engagement, the August 2013 Engagement, the March 2014 Engagement, and the March 2017 Engagement.

355.    Contained within their fiduciary duty, Defendants were under an obligation to give candid legal advice to Luiza and a duty to represent Luiza diligently and competently on matters within the scope of their representations of her.

356.    Defendants breached their duty of loyalty to Luiza in representing Luiza solely to benefit their other client, Natalia.

357.    Defendants failed to warn Luiza of Natalia's fraudulent conduct and attempted to protect Natalia from liability flowing from her misconduct by failing to disclose in writing in

44

transactions with the third parties referenced herein, that Luiza was the nominal owner of the 40% Interest or nominal borrower, as the case may be, despite clear instructions from Luiza to do so.

358.    Furthermore, John deceived Luiza by purportedly representing Luiza's interests in the representative matters when John was representing Natalia's adverse interests, and lying to Luiza about Natalia's whereabouts after Natalia abandoned Luiza in 2016.

359.    John engaged in conduct that led Luiza to believe that Luiza was his client, and that Defendants were her attorneys, who would counsel and protect her with competent representation and legal advice as to the representative matters.

360.    Defendants engaged in conduct that nearly ensured Luiza was exposed to and unprotected from liability flowing from Natalia's conduct and transactions in the 40% Interest and in related matters pertaining to the nominee relationship between Natalia and Luiza.

361.    Defendants protected Natalia at the expense and to the detriment of Luiza.

362.    Defendants breached their fiduciary duty by concurrently representing Luiza and Natalia in the representative matters while Natalia was in an adverse position towards Luiza.

363.    The specific acts alleged herein by John and CSPC fully demonstrate their breaches of fiduciary duty owed to Luiza and the injuries Luiza has sustained as a proximate result.

## E.    *Negligent Representation*

364.    Luiza would have received immunity from liability for the acts of her principal Natalia but for Defendants' failure to timely disclose the relationship to third parties.

365.    Luiza also would have received the $3 million consideration from Natalia's financings on the 40% Interest but for Defendants' liquidating the interest in transfers to MIC and FPG, and in collateralized loans to Bernstein, Lee, Belkhorev and Lee – all for Natalia's benefit.

366.    An attorney in a counselling situation must advise a client of the risks of the transaction in terms sufficiently clear to enable the client to assess the risk.

367.    The care must be commensurate with the risk of the undertaking and tailored to the needs and sophistication of the client.

368.    Luiza was entirely unsophisticated as compared to Natalia and John.

369.    Luiza was serving as a personal assistant and a translator to Natalia at the time of the initial July 2013 Engagement and throughout.

370.    Luiza had also become close friends with Natalia.

371.    A reasonably prudent attorney similarly situated to John and with John's level of expertise and sophistication would have anticipated the risk that his representing Luiza and Natalia concurrently as agent and principal, and as nominal owner and beneficial owner, in respect of the Bankruptcy, the JV Closing and all the liquidations on the 40% Interest beneficially held by Natalia, would cause injury or harm to Luiza.

372.    A reasonably prudent attorney similarly situated to Defendants would have ensured that, when they represented to their client that she, as an agent or nominal owner of an asset, would not be liable for any of the transactions with that asset, that in the attorneys' preparation of transactional documents concerning that asset, their client as nominee would be disclosed as the nominal owner thereof on behalf of the principal and legal owner (the person with authority and discretion and benefit in regard to the asset).

373.    Defendants advised Luiza she would not have liability, but John and CSPC structured all transactions related to the 40% Interest in a manner whereby Luiza was ensured to have liability – the exact opposite of their counsel and advice to Luiza.

374.    This constitutes a departure from the reasonable standard of care for counsel.

375.    Luiza's injuries were not only foreseeable as a consequence of Defendants' negligence; they appear designed.

376.    No reasonable attorney similarly situated with Defendants would represent the adverse interests of Natalia and Luiza as to the representative matters.

377.    No reasonably prudent attorney similarly situated with Defendants would have curated their representation to one client over another client to the detriment of the other client, as Defendants did here between Natalia and Luiza, causing financial harm to Luiza, including the loss of the $3 million consideration.

378.    For these reasons, and the reasons set forth in greater detail herein, John and CSPC negligently represented Luiza in the representative matters.

## F.    *Vicarious Liability*

379.    An employer is vicariously liable for the torts of an employee if the employee was acting within the scope of his or her employment at the time the tort was committed.

380.    An employee is acting within the scope of employment if the action is of the kind the employee is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is actuated, at least in part, by a purpose to serve the employer.

381.    The legal services provided by John under the July 2013 Engagement, the August 2013 Engagement, the March 2014 Engagement, and the March 2017 Engagement were all of the kind CSPC employed John to perform.

382.    CSPC describes John's legal services as representing owners, operators, investors and lenders, ranging from individuals operating from home offices to prominent institutional and non-institutional firms, including private equity funds; that John guides clients through negotiations involving a range of commercial real estate assets including retail shopping centers,

multifamily, mixed-use and public self-storage located across the country; and that his practice is national in scope, encompasses a full range of commercial real estate transactions, and focuses on acquisitions and dispositions (including distressed debt and equity transactions), financing transactions (including construction, mezzanine and preferred equity) and development projects.

383.    The legal services provided by John under the July 2013 Engagement, the August 2013 Engagement, the March 2014 Engagement, and the March 2017 Engagement are of the kind CSPC employed John to perform and they were performed to serve CSPC.

384.    A law firm is subject to civil liability for injury caused to a person by any wrongful act or omission of a principal or employee of the firm who was acting in the ordinary course of the firm's business or with actual or apparent authority.

385.    The legal services John provided Luiza under the July 2013 Engagement, the August 2013 Engagement, the March 2014 Engagement, and the March 2017 Engagement were provided in the ordinary course of CSPC's business and with the actual or apparent authority of CSPC.

386.    CSPC is liable for the injuries Luiza sustained by the acts and omissions of John and other employees or members of CSPC acting in the ordinary course of the firm's business with actual or apparent authority as to the representative matters.

### G.    *Injuries and Damages*

387.    As a direct and proximate result of Defendants' misconduct, Luiza has been injured and will be injured in the future.

#### (i)      *$3 Million Consideration*

388.    As a direct and proximate result of John's and CSPC's malpractice in respect of the Bankruptcy, the formation and organization of the NP Companies, the Equity Preservation Plan,

the Bankruptcy Plan, and the JV Closing, their failure to reduce the Material Considerations to a writing, and their selling away the 40% Interest, Luiza has been substantially injured and will be substantially injured.

389.    CSPC represented to the Bankruptcy court that Luiza would take ownership of an indirect 40% interest in the buyer of the Bankruptcy debtor's sole asset, the Madison 33 Property.

390.    CSPC formed and organized two companies through which Luiza was intended to own that 40% Interest – NP Holding and NP Member.

391.    Defendants structured NP Holding and NP Member and represented as true to the Bankruptcy court and to all third parties with access to the docket that Luiza was the only owner.

392.    Luiza, who had no ownership or equity in the debtor that owned the Madison 33 Property in Bankruptcy, was going to receive (without payment) an indirect 40% Interest in the purchaser of the Bankruptcy debtor's sole asset, *i.e.*, the Madison 33 Property.

393.    As a result of Luiza receiving the ownership of the 40% Interest through the eponymous NP companies, Luiza had to transfer the benefits of that interest to Natalia so that Natalia could liquidate or encumber the interest to suit Natalia's objectives.

394.    However, a written transfer of the beneficial interest in the 40% Interest between Luiza and Natalia never occurred.

395.    There was never a written agreement or assignment prepared by Defendants whereby Luiza transferred ownership of the 40% Interest, in whole or in part, the title or the benefit, to Natalia.

396.    Despite the absence of a writing indicating Luiza had transferred the 40% Interest to Natalia, Defendants knew Luiza was only to be in title as to the 40% Interest after the JV Closing as a straw owner for Natalia, and that in return for Luiza having created a 40% Interest in the 172

Madison Real Estate Project for Natalia by use of Luiza as nominee, Luiza was to be compensated in the amount of $3 million.

397.    Without Luiza's willingness and ability (including her creditworthiness) to take title to the indirect 40% Interest of the purchaser of the Bankruptcy debtor's sole asset (the Madison 33 Property) for the purpose of permitting Natalia to transact business in that 40% Interest in Luiza's name, Natalia would have lost the equity she had in the 172 Madison Real Estate Project to the lender in the foreclosure against the Madison 33 Property which Luiza's participation in the Bankruptcy sale avoided.

398.    After the JV Closing and but before any portion of the 40% Interest was assigned, sold, transferred, collateralized or pledged to third parties, the 40% Interest was valued at approximately $64 million.

399.    For creating that $64 million value for Natalia, Luiza was to be compensated in the amount of $3 million as consideration.

400.    The $3 million consideration was to come from financings or distributions on the 40% Interest.

401.    Defendants represented Luiza in respect of Luiza's interest as the owner of NP Holding, which owned 100% of NP Member, which owned 40% of the member of the buyer of the Bankruptcy asset, the Madison 33 Property.

402.    Defendants prepared the operating agreement for NP Member indicating that all of the membership interest of NP Member was owned by NP Holding.

403.    Defendants prepared the operating agreement for NP Holding indicating that all the membership interest of NP Holding was owned by Luiza.

404.    Due to Defendants' neglect in failing to advise Luiza of her rights in the protection of the $3 million due to her from financings or sales of the 40% Interest post-JV Closing, Luiza participated in the JV Closing, which created a $64 million value for Natalia, without simultaneously reducing to a writing the $3 million consideration due to Luiza for creating that value for Natalia in the first instance.

405.    As a result of Defendants' neglect, incentive was lost that was present before the JV Closing to reduce the arrangement to a writing.

406.    Before the JV Closing, Natalia would have consented to reducing her promised $3 million consideration to Luiza in writing, in the form of a secured promissory note, or other agreement, including that, *e.g.*, as to each financing or sale made on the 40% Interest, Luiza would receive a certain percentage until paid in full for the $3 million.

407.    But Defendants did none of these things.

408.    Defendants permitted Luiza to perform fully in the Bankruptcy and the JV Closing with respect to the Equity Preservation Plan and the Bankruptcy Plan in creating the $64 million value for Natalia without any written document indicating the scope of Luiza's services or payment to her for her performance to Natalia in creating the $64 million for Natalia.

409.    Accordingly, there is no writing signed by Natalia memorializing the $3 million consideration and Natalia contends that Natalia did not agree to pay Luiza with the $3 million.

410.    Nevertheless, John admitted in a June 2014 email with another CSPC partner that up to $2.3 million on distributions from the 40% Interest was to go to Luiza.

411.    But for Defendants' malpractice, Luiza would have had an enforceable writing concerning her consideration of $3 million and could have enforced it in connection with the Natalia's liquidations of the 40% Interest in the transactions and financings as described herein.

412.    Wherefore, Luiza has been injured in the amount of $3 million due to John's and CSPC's malpractice in respect of the $3 million consideration.

413.    Natalia is judgment proof.

(ii)    *Indemnity – Costs and Fees Incurred*

414.    Luiza was further injured at the time of the JV Closing in that Defendants failed to negotiate, advise and/or otherwise provide for the personal protection of Luiza in serving as nominal owner of the 40% Interest, including resourced indemnification from Natalia for any liability that may flow from her transactions in the 40% Interest.

415.    If Defendants not been conflicted in their service to the concurrent representation of Natalia's interests, Defendants would have, simultaneously with the JV Closing, caused an indemnity agreement, supported by insurance or other security, to be reduced to a writing in respect of Luiza's creation of a $64 million value for Natalia and taking nominal title to that value via the 40% Interest in Luiza's name.

416.    Otherwise, Luiza would not have agreed to the arrangement if she had known the exposure created thereby, but which Defendants failed to advised Luiza regarding and in fact, advised Luiza that she would not have any personal liability in regard to the nominee status.

417.    Had Defendants advised Luiza of Luiza's personal exposure and liability as to Natalia's ownership of the 40% Interest in Luiza's name, they would have also counseled Luiza to require a supported indemnity agreement, which they did not do.

418.    Defendants organized the NP Companies and prepared their operating agreements with Luiza as the sole owner of NP Holding, and NP Holding the sole member of NP Member.

419.    Defendants also proposed Luiza to take 40% of the Madison 33 Property in Bankruptcy through the Joint Venture between the NP Holding and NP Member companies and the developer (Tessler) and were architects of the Equity Preservation Plan.

420.    Defendants were also present at the JV Closing where Luiza was required to sign, at the direction of John, many closing documents concerning Luiza's 40% Interest in the Madison 33 Property to be taken in her name for the benefit of Natalia.

421.    Defendants also counseled and advised Luiza in respect of all the papers for NP Holding and NP Member that Luiza signed in connection with the Bankruptcy and in the organization of those companies.

422.    John told Luiza that she had no personal liability as nominee, which was false.

423.    But for Defendants' malpractice, Luiza would not have participated as nominee, would have been shielded from personal liability, and/or would have had a supported indemnity agreement with Natalia to pay defense costs and other expenses related to liabilities created by Natalia's financings and transactions described herein.

424.    Due to Defendants' neglect, Luiza has incurred defense costs and attorney's fees in defending herself as to Natalia's beneficial ownership of the 40% Interest and Luiza's nominal title to same.

425.    These fees and costs have been incurred in the FGP Litigation, the MIC Litigation (joined with the FGP Litigation), the Lee-Goldberg Litigation, and the Russian Bank Litigation.

426.    Luiza has incurred other attorney's fees in general representation matters concerning her nominal ownership of NP Member, including in respect of capital calls, tax matters, and negotiations with Natalia's counsel regarding the nominal ownership and rights and liabilities flowing therefrom.

427.    These defense costs and fees were proximately caused by Defendants' malpractice in failing to competently represent Luiza in respect of a supported indemnity agreement simultaneously with the JV Closing and the creation of a $64 million value for Natalia in Luiza's name, upon which Natalia would transact business by sales and loans.

428.    Luiza will be continually damaged in respect of incurring attorney's fees and costs into the future in respect of the FGP Litigation, the MIC Litigation, the Lee-Goldberg Litigation, and the Russian Bank Litigation ("**Pending Litigations**") and in the general representation of Luiza regarding the NP Holding and NP Member 40% Interest in an amount to be determined at trial but not less than $400,000.

### (iii)    *Unit 16H Equity, Attorney's Fees and Money Judgment*

429.    As a direct and proximate result of Defendants' malpractice in respect of the $2.2 Million Loan, Luiza has been injured.

430.    The $2.2 Million Note and $2.2 Million Mortgage taken in 2014 were at the request of Defendants' client Natalia.

431.    Natalia controlled the disbursement of the proceeds from the $2.2 Million Loan.

432.    Natalia and Defendants failed to protect Luiza's equity in Unit 16H in connection with Natalia's receipt of the $2.2 Million Loan secured by Luiza's residence, Unit 16H.

433.    Title to Unit 16H and ownership of Unit 16H was Luiza's.

434.    Defendants failed to advise Luiza that Luiza was the only borrower identified in the $2.2 Million Note and $2.2 Million Mortgage, and that if Natalia did not repay the $2.2 Million Loan, Luiza would be liable for deficiency, attorney's fees and foreclosure of her Unit 16H residence.

435.    Defendants failed to disclose Luiza in the $2.2 Million Loan documents as the nominal agent for Natalia in respect of the $2.2 Million Loan, and that no portion of the proceeds were taken by or loaned to Luiza.

436.    Defendants failed to attempt to negotiate or secure any indemnity from Natalia for Luiza in respect of the protection of Luiza from personal liability for attorney's fees in a lawsuit on the $2.2 Million Mortgage or to protect Luiza's equity by, *e.g.*, requiring that the value of Luiza's equity be paid to Luiza out of the $2.2 Million Loan Natalia took in Luiza's name.

437.    Defendants failed to do any of these basic matters of diligent representation of their client Luiza because John and CSPC were conflicted and were representing the adverse interests of their other client, Natalia.

438.    Defendants instructed, counseled and advised Luiza to sign all documents associated with Natalia's $2.2 Million Loan without providing any competent advice or counsel to Luiza as to Luiza's liability or as to the protection of Luiza's Unit 16H equity, and without any payment to Luiza in the amount of her equity in Unit 16H in connection with the $ 2.2 Million Loan.

439.    Luiza was also not disclosed as the agent nor was Natalia referenced as the individual to be liable for any deficiency or attorney's fees in the $2.2 Million Loan documents.

440.    Defendants and the $2.2 Million Loan lender's attorneys structured the $2.2 Million Loan documents to falsely indicate that Luiza was borrowing the money from the $2.2 Million Loan lender and that Natalia was a stranger to the transaction.

441.    Meanwhile, the $2.2 Million Loan lender actually negotiated the $2.2 Million Loan directly with the true borrower, Natalia, and possessed actual knowledge that the borrower in fact

was Natalia and that the transaction in Luiza's name was a nullity as to Luiza, who was not the borrower.

442.    Defendants failed to advise Luiza in 2015 when instructing her to sign the 2015 Forbearance Agreement that Luiza was waiving all her rights to dispute the validity of the debt and $2.2 Million Note and $2.2 Million Mortgage as against her, and that she was waiving all claims she might have against the $2.2 Million Loan lender.

443.    The trial court in the 16H Foreclosure held that Luiza's defenses and claims of fraud in the mortgage transaction as to her were belied by the fact that she was represented by counsel, John, and the appeals court held that Luiza could not sustain any of her defenses because she waived them all in the 2015 Forbearance Agreement and because Luiza was represented by counsel, John.

444.    On appeal from the 16H Foreclosure judgment, the court specifically held that Luiza's "affirmative defenses, however, are precluded by a forbearance agreement in which [she] waived any affirmative defenses in exchange for, inter alia, an extension of time to repay the loan[,] [and the] Supreme Court correctly refused to deny the motion as premature pursuant to CPLR 3212(f) because [as] the affirmative defenses are precluded, no discovery could lead to facts that would warrant the denial of [the lender's] summary judgment motion."

445.    Defendants caused and instructed Luiza to enter into the 2016 Forbearance Agreement that modified the 2015 Forbearance Agreement extending the payment deadline to December 31, 2016.

446.    Again, Defendants failed to represent Luiza's interests in the 2016 Forbearance Agreement by obtaining payment to Luiza of Luiza's equity in Unit 16H as a condition of her entering into the modified forbearance, and this is especially so, given John's and CSPC's

knowledge that Natalia had been unwilling to repay the $2.2 Million Loan on its last two maturity dates, and given that Natalia's interests were adverse to Luiza's, in that Natalia was defrauding Luiza out of Luiza's equity and out of her residence in Unit 16H.

447.   But for Defendants' malpractice in respect of the $2.2 Million Mortgage and $2.2 Million Note, Luiza would not have incurred attorney's fees and costs in defending the 16H Foreclosure (approximately $50,000.00), including the appeal (approximately $25,000.00), and Luiza would not have lost the value of the equity she had in Unit 16H, which was $100,000.00 in 2008 and approximately valued at $300,000.00 at the time of the malpractice, and Luiza would not have a judgment against her in the amount of $165,000.00 for the $2.2 Million Loan lender's attorney's fees.

### (iv)   *Unit 5-I (220 Riverside Blvd.) Equity*

448.   As a direct and proximate result of Defendants' malpractice in respect of the transfer of Luiza's apartment Unit 5-I at 220 Riverside Blvd., Luiza has been injured.

449.   Since 2008, the parents of attorney Mermelstein had been residing in Luiza's apartment Unit 5-I exchange for a debt that Natalia owed Mermelstein for past legal services.

450.   The parents of Mermelstein paid monthly maintenance on Unit 5-I but they did not pay Luiza to acquire Unit 5-I, as that consideration was to be made to Natalia by the cancellation of Natalia's debt to Mermelstein, and title to Unit 5-I was not transferred in 2008.

451.   Luiza had used all her savings and funds to pay portions of Natalia's debts since in or around 2014 and through the abandonment of Luiza in 2016.

452.   As a result, the 220 Riverside Mortgage that was going to foreclose in 2017 for non-payment, as Luiza had no money remaining after trying to pay the Unit 16H maintenance and

other bills, with no income other than her savings and modest social security income, and Natalia was missing as to Luiza.

453.    To keep Unit 5-I from foreclosure in 2017, Mermelstein requested to transfer title in Unit 5-I from Luiza to him or his designee, and to pay the amount of the 220 Riverside Mortgage, but not to pay Luiza any portion of the $500,000.00 equity she had in Unit 5-I.

454.    After accounting for the 220 Riverside Mortgage payoff amount, Luiza's equity in Unit 5-I was approximately $500,000.00.

455.    Mermelstein had no contractual right with Luiza requiring Luiza to sell or transfer Unit 5-I to Mermelstein prior to the March 2017 Engagement.

456.    Because Unit 5-I was supposed to be payment of Natalia's debt to Mermelstein, and because John and CSPC were was serving Natalia's interest in ensuring Luiza's apartment Unit 5-I was used to satisfy Natalia's debt to Mermelstein, John failed to competently advise Luiza in the transaction, including that Luiza had the ability to sell Unit 5-I to recover her equity and to pay off the 220 Riverside Mortgage out of the proceeds of the sale, and that she was not obligated to transfer Unit 5-I to Mermelstein to pay Natalia's debt to Mermelstein.

457.    Notwithstanding, Defendants caused and instructed Luiza to transfer her title to Unit 5-I to Mermelstein or his designee for no consideration to Luiza in March 2017 pursuant to the March 2017 Engagement.

458.    Defendants drafted a contract with Mermelstein that indicated a market purchase price, but this price was agreed to by John and Mermelstein to deceive the condominium's board out of the building's right of first refusal as to Unit 5-I.

459.    If the stated contract price had been the price of the 220 Mortgage payoff plus transfer taxes, which was the actual price, then the condominium  board would presumptively have

exercised their right to acquire Unit 5-I at well below market, but because the contract John and Mermelstein prepared listed a competitive price, which was not paid, the condominium board did not exercise its right, and Mermelstein or his designee received Unit 5-I below market and without any consideration to Luiza.

460.    Mermelstein paid Defendants' attorney's fees and costs for their legal representation of Luiza in Luiza's transfer of Unit 5-I to Mermelstein.

461.    The Unit 5-I transfer occurred at a time when Luiza had not been able to contact Natalia for over a year.

462.    Meanwhile, Defendants were still serving Natalia's interest, and being paid by Natalia or by others on her behalf, were lying to Luiza when Luiza asked John if he had heard from Natalia, all to the detriment of Luiza in respect of her $500,000.00 equity in Unit 5-I lost to Mermelstein and Natalia due to John's malpractice.

463.    At or about the same time that John caused Luiza to lose her $500,000.00 worth of equity in Unit 5-I to Mermelstein, the $2.2 Million Loan lender began the 16H Foreclosure against Luiza on her Unit 16H residence.

### (v)    *FGP Transfer*

464.    As a direct and proximate result of John's and CSPC's malpractice in respect of the FGP Transfer, Luiza has been injured and will be injured in the future.

465.    In representing Luiza on the FGP Transfer, John and CSPC drafted and prepared the FGP Transfer documents so that Natalia is hidden as the actual or beneficial owner, and they do not describe the relationship between Natalia and Luiza for purposes of principal-agent disclosure and third-party claims, and the documents also do not require that all defense, liability, claims, or demands of any kind concerning the FGP Transfer are to be made against Natalia as the

disclosed principal and beneficial owner of the interest transferred to the exclusion of the agent Luiza.

466.    In representing Luiza on the FGP Transfer, Defendants failed to advise Luiza that, as prepared by Defendants, the FGP Transfer documents do not disclose Natalia as the actual or beneficial owner, do not describe the relationship between Natalia and Luiza for purposes of principal-agent disclosure and third-party claims, and do not require that all litigation defense, liability, claims or demands of any kind concerning the FGP Transfer are to be made exclusively against Natalia as the principal and beneficial owner of the interest transferred to the exclusion of the agent Luiza.

467.    Defendants later admitted, during John's deposition in the FGP Litigation, that "it was no secret" to anyone with whom Natalia was negotiating to encumber or liquidate her interest in NP Holding, that the interest was Natalia's, and that Luiza was being used to hold the interest nominally for Natalia's use and benefit.

468.    Nevertheless, Defendants failed to reduce this allegedly openly known fact to a writing signed by FGP, such that, in the event of a dispute concerning the FGP Transfer, FGP could only hold Natalia liable to the exclusion of Luiza as the agent of a disclosed principal.

469.    Furthermore, Defendants, because they were prioritizing Natalia, whose interests were adverse to Luiza's, failed to reduce to a writing as between Luiza and Natalia their relationship as it concerned the FGP Transfer, the liability for the FGP Transfer, or the right of Luiza to supported indemnity from Natalia, including defense costs, in the event FGP made any claim or demand on Luiza.

470.     In fact, Defendants, presented different information to different third parties concerning the relationship between Luiza and Natalia, depending on the circumstances at the time and how they served Natalia's interests.

471.     Additionally, John and CSPC, due to their conflict of interest, failed to represent Luiza's interests in receiving all or a portion of her earned $3 million consideration.

472.     The FGP transfer, valued at $20 million in consideration to Natalia, should have accounted for a portion thereof to be paid to Luiza, towards satisfaction of the $3 million consideration Natalia promised to Luiza as payable from financings or distributions on the 40% interest.

473.     Insofar as approximately half of the 40% interest was sold to FGP in the FGP Transfer, Luiza's recovery of the $3 million consideration based on the 40% interest was reduced by half as of the date of the FGP Transfer.

474.     With knowledge of the foregoing, John and CSPC did nothing to protect Luiza or represent her interest and right to be paid all or a portion of the $3 million consideration from the proceeds of the FGP Transfer.

475.     Furthermore, John and CSPC, in representing Luiza in the FGP Litigation, failed to disclose Luiza as the nominee and agent for Natalia in the FGP Transfer, because John and CSPC were still representing Natalia's interests in the FGP Litigation and were conflicted by the adverse interests of Natalia and Luiza, and chose to continue to serve Natalia's interests.

476.     As a result, once Luiza retained new counsel and her defense was laid bare for the court in the FGP Litigation, the Court discounted Luiza's defense of agency as an "ever evolving story" because her position had changed from when CSPC and John were representing Luiza as

compared to later, when non-conflicted counsel was representing Luiza, and this damaged Luiza's credibility and her defenses.

477.    Luiza's credibility has been hampered by her initial answer in the FGP Litigation by various admissions and representations that her agency defense contradicts in her answer to FGP's amended complaint, filed after terminating CSPC and retaining non-conflicted counsel.

478.    Defendants acknowledged their conflict of interest as serving adverse interests only when they attempted to have Luiza waive the conflict after the commencement of the FGP Litigation, stating it would be in Luiza's interest to assert an agency defense while it was in Natalia's to not disclose her ownership of the transferred interests.

479.    This conflict and adversity of interests existed before the FGP Litigation commenced.

480.    This conflict existed at the time of the Bankruptcy, the Equity Preservation Plan, the Disclosed Bankruptcy Plan, and the JV Closing.

481.    At all relevant times, CSPC and John were continually conflicted in their concurrent representation of the adverse interests of Luiza and Natalia to the detriment of Luiza.

482.    In the FGP Transfer documents, Luiza is liable for attorney's fees in the event of a dispute with FGP.

483.    FGP has already received partial summary judgment on its claim that the transfer to it of the 49% interest of NP Holding was a valid transfer.

484.    FGP also had a right of first refusal under the FGP Transfer documents, and entitlement to attorney's fees.

485.    The FGP Litigation is pending.

486.    Should a monetary judgment enter against Luiza in the FGP Litigation, such judgment as to Luiza is a direct and proximate result of the malpractice of John and CSPC, and they are liable therefor.

### (vi)    MIC Transfer

487.    As a direct and proximate result of John's and CSPC's malpractice in the MIC Transfer, Luiza has been injured and will be injured in the future.

488.    In representing Luiza on the MIC Transfer, John and CSPC drafted and prepared the MIC Transfer documents so that they do not disclose Natalia as the actual or beneficial owner, do not describe the relationship between Natalia and Luiza for purposes of principal-agent disclosure and third-party claims, and do not require that all litigation, defense, liability, claims or demands of any kind concerning the MIC Transfer be made exclusively against Natalia as the principal and beneficial owner of the interest transferred to the exclusion of Luiza.

489.    In representing Luiza on the MIC Transfer, John and CSPC failed to advise Luiza that, as prepared by John and CSPC, the MIC Transfer documents do not disclose Natalia as the actual or beneficial owner, do not describe the relationship between Natalia and Luiza for purposes of principal-agent disclosure and third-party claims, and do not require that all litigation, liability, claims or demands of any kind concerning the MIC Transfer be made exclusively against Natalia as the principal and beneficial owner of the interest transferred.

490.    Defendants later admitted during a deposition in the FGP and MIC Litigations, that "it was no secret" to anyone with whom Natalia was negotiating to encumber or liquidate her interest in NP Holding, that the interest was Natalia's, and that Luiza was being used to hold the interest nominally for Natalia's use and benefit.

63

491.    Nevertheless, Defendants failed to reduce this allegedly openly known fact to a writing signed by MIC, such that, in the event of a dispute concerning the MIC Transfer, MIC could only hold Natalia liable to the exclusion of Luiza as the agent of a disclosed principal.

492.    Furthermore, Defendants, because they were serving their real client, Natalia, whose interests were adverse to Luiza's, failed to reduce to a writing as between Luiza and Natalia detailing their relationship as it concerned the MIC Transfer, the liability for the MIC Transfer, or the right of Luiza to supported indemnity from Natalia, including defense costs, in the event MIC made any claim or demand on Luiza.

493.    Additionally, Defendants, due to their conflict of interest, failed to represent Luiza's interests in receiving all or a portion of her earned $3 million consideration.

494.    The MIC Transfer transferred $5 million in cash wires as consideration to Natalia.

495.    A portion of that $5 million consideration should have been paid to Luiza, towards satisfaction of the $3 million consideration Natalia promised to Luiza as payable from financings or distributions on the 40% interest.

496.    Insofar as approximately half of the 40% interest was being sold to MIC in the MIC Transfer, Luiza's recovery of the $3 million consideration based on the 40% interest was reduced by half as of the date of the MIC Transfer.

497.    Moreover, the assignment to MIC included the right of MIC to acquire the remaining 51% interest in NP Holding if MIC paid the $4.35 Million Loan, which MIC did, and therefore, allegedly became entitled to or allegedly acquired 100% of the NP Holding's 40% interest in the 172 Madison Real Estate Project (subject to FGP's claims).

498.    The sale to MIC of the same interest previously sold to FGP liquidated Natalia's entire interest and reduced her liability.

64

499.    The sale to MIC of the same interest previously sold to FGP increased Luiza's liability to both MIC and FGP.

500.    Luiza received no portion of the $5 million that Natalia received from the sale to MIC of the same interest Natalia previously sold to FGP in Luiza's name.

501.    Defendants prepared, drafted, and negotiated the MIC Transfer documents in such a manner whereby only Luiza would be liable for Natalia's double-selling, and Natalia would remain shielded from liability as the undisclosed principal and beneficiary.

502.    Defendants, due to their conflict of interest, failed to represent Luiza's interests in receiving all or a portion of her earned $3 million consideration in the MIC Transfer proceeds.

503.    In addition to double selling the interest, John and CSPC did nothing to protect Luiza or her right in being paid her $3 million consideration from the proceeds of the MIC Transfer, which was to be potentially 100% of the interests of NP Holding, thus erasing Luiza's ability to recover her $3 million consideration from financings or distributions on the 40% interest NP Holding held via NP Member in the 172 Madison Real Estate Project.

504.    In the MIC Transfer documents, Luiza is liable for attorney's fees in the event of a dispute with MIC.

505.    Because FGP has already received partial summary judgment on its claim that the transfer to it of the 49% interest of NP Holding was a valid transfer, MIC seeks damages from Luiza for the consideration it provided to Natalia, not less than $5 million cash.

506.    To the extent FGP is ordered to have a prevailing right of first refusal for the remaining 51% of NP Holding, MIC seeks damages against Luiza for the $4.35 Million Loan it paid to purportedly acquire the 51% interest in exercise of its option in the MIC Transfer documents.

507.    MIC also seeks attorney's fees and costs in the MIC Litigation.

508.    Should a monetary judgment enter against Luiza in the MIC Litigation, such judgment as to Luiza is a direct and proximate result of the malpractice of John and CSPC, and they are liable therefor.

### (vii)    *Lee-Goldberg Loans*

509.    As a direct and proximate result of Defendants' malpractice in respect of the $2 Million Belkhorev Note (assigned to Goldberg), the $1 Million Goldberg Note, and the $1 Million Lee Note, Luiza has sustained injury and will be injured in the future.

510.    In June 2015, Defendants prepared and caused, counseled and instructed Luiza to sign the $1 Million Goldberg Note, the $1 Million Lee Note, and the $2 Million Belkhorev Note (the "Promissory Notes").

511.    Natalia requested Defendants to prepare the Promissory Notes and to cause Luiza to sign the Promissory Notes.

512.    Each of the Promissory Notes indicate the subject note as secured by Luiza's "beneficial interest" in the 172 Madison Real Estate Project.

513.     The foregoing indication in the Promissory Notes was false at the time John and CSPC prepared and instructed Luiza to sign the Promissory Notes, as Luiza had only held "nominal interest" to the 40% in the 172 Madison Real Estate Project since, simultaneously with the JV Closing and the creation of the $64 million value attaching to that 40% interest, there was an actual or constructive transfer to Natalia of all beneficial interest and control and discretion over that 40% interest.

514. Defendants knew that Luiza did not hold beneficial interest in NP Holdings' 40% interest in the 172 Madison Real Estate Project at the time John and CSPC instructed Luiza to sign the Promissory Notes.

515. Defendants instructed Luiza to sign the Promissory Notes with the knowledge that the Promissory Notes represented monies lent to Natalia and not to Luiza.

516. Defendants failed to advise Luiza at the time John and CSPC prepared the Promissory Notes and instructed Luiza to sign them that Luiza would be personally liable on the Promissory Notes if Natalia did not pay them, even though all of the proceeds on the face value of the Promissory Notes went to Natalia, which John and CSPC also knew.

517. Defendants failed to protect Luiza's interest in the $3 million consideration she was to receive from financings on Natalia's beneficial interest in connection with the Promissory Notes, which were apparently secured but not perfected by all of NP Holdings' beneficial interest in the 172 Madison Real Estate Project.

518. Defendants drafted the Promissory Notes so they would be paid with proceeds from distributions NP Holding received on the beneficial 40% interest in the 172 Madison Real Estate Project, further encumbering Luiza's unrecorded right to the $3 million consideration for her service in the Bankruptcy and the JV Closing, creating the $64 million value on the 40% interest for Natalia.

519. Defendants failed to disclose Luiza in the Promissory Notes as the agent for Natalia and as nominal maker and nominal owner of the 40% interest for transfer purposes.

520. Defendants failed to provide for all liability resulting from the Promissory Notes to be borne by Natalia to the exclusion of the transfer agent and nominal maker, Luiza, in any action or dispute arising out of or related to the Promissory Notes.

521.    The Lee-Goldberg Litigation is pending.

522.    Should a monetary judgment enter against Luiza in the Lee-Goldberg Litigation, such judgment as to Luiza is a direct and proximate result of the malpractice of John and CSPC, and they are liable therefor.

523.    Wherefore, Luiza has been injured in the amount of any monetary judgment entered against her in the Lee-Goldberg Litigation, plus all or a portion of the $3 million consideration lost or encumbered by the Promissory Notes, plus defense costs and attorney's fees incurred in the Lee-Goldberg Litigation.

## **JURY DEMAND**

524.    Plaintiff demands a trial by jury on all issues triable of right by a jury.

## **AD DAMNUM**

WHEREFORE, Luiza demands judgment against Defendants, in an amount to be determined at trial, but not less than FIVE MILLION FOUR HUNDRED AND FORTY THOUSAND DOLLARD ($5,440,000.00) as follows.

a.  In an amount to be determined, but not less than THREE MILLION DOLLARS ($3,000,000) in damages resulting from the loss of the consideration due to Claimant for her participation in the Bankruptcy and the JV Closing, creating the 40% beneficial interest for Natalia.

b.  In an amount to be determined, but not less than FIVE HUNDRED FORTY THOUSAND DOLLARS ($540,000) in damages resulting from the loss of Claimant's equity in Unit 16H ($300,000), plus the monetary judgement for attorney's fees and costs in the 16H Foreclosure ($165,000) with interest, together with defense costs and attorney's fees ($75,000).

68

c. In an amount to be determined, but not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000) in damages resulting from the loss of Claimant's equity in 220 Riverside, Unit 5-I.

d. In an amount to be determined, but not less than FOUR HUNDRED THOUSAND DOLLARS ($400,000) in damages resulting from defense costs and attorney's fees in the Pending Litigations.

e. The amount of any and all monetary judgments entered against Luiza in the Pending Litigations.

f. ONE MILLION DOLLARS ($1,000,000) in punitive damages.

g. Attorney's fees and costs incurred by Plaintiff in the preparation and prosecution of this Action.

h. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       November 20, 2023

**WOODS LONERGAN PLLC**

*Annie E. Causey*

Annie E. Causey, Esq.
James F. Woods, Esq.
60 East 42nd Street, Suite 1410
New York, New York 10165
(212) 684-2500
acausey@woodslaw.com
jwoods@woodslaw.com
*Attorneys for Plaintiff Luiza Dubrovsky*